WELLINGTON BULL & Co., INC., Suing for Itself and in Behalf of All Other Holders of the Common Stock of the INDUSTRIAL FINANCE CORPORATION Who Desire to Come in and Contribute to This Action, Plaintiffs, *v.* ARTHUR J. MORRIS and Others, Defendants.

Supreme Court, New York County, July 5, 1928.

Corporations — representative action to compel defendants to return stock to corporation — stock was granted to one of defendants in consideration of services in refinancing corporation — board of directors had power to pay for work done which was outside of regular work of officer of corporation — plaintiff is estopped since its stock voted to ratify act of directors.

This is a stockholders' representative action to compel one of the defendants to surrender to the corporation 30,000 shares of the common stock of the corporation. The stock in question was issued to said defendant upon a refinancing of the corporation and in consideration of his services in that regard. It appears that he was paid a salary for his regular work as an officer of the corporation. The board of directors had the power to grant him extra compensation, and there is no evidence to the effect that there was any actual fraud in any of the transactions leading up to the issuance of the stock, but on the other hand it appears that all of the transactions were fully discussed and that final action was not taken except after deliberate consideration.

Furthermore, the plaintiff is estopped from maintaining this action, for its stock was voted by proxy at a stockholders' meeting to approve the very transaction now under attack.

The plaintiff cannot avoid the estoppel by characterizing the solicitation of its proxy and the vote of ratification as the final act in a fraudulent scheme, for that position is inconsistent with plaintiff's disclaimer of any actual fraud.

STOCKHOLDER'S SUIT to compel the defendant Morris to surrender to the defendant Industrial Finance Corporation 30,000 shares of its common stock.

*Gleason, McLanahan, Merritt & Ingraham* [*Scott McLanahan* and *Walter Gordon Merritt* of counsel], for the plaintiff.

*Root, Clark, Buckner, Howland & Ballantine* [*Arthur A. Ballantine* of counsel], for the defendant Industrial Finance Corporation.

*Shearn & Hare* [*Clarence J. Shearn* and *Charles C. Smith* of counsel], for the defendant Markle.

*Satterlee & Canfield* [*R. Randolph Hicks* and *Lloyd F. Thanhouser* of counsel], for other defendants.

FRANKENTHALER, J. This is a stockholder's suit to compel the defendant Morris to surrender to the corporate defendant Industrial Finance Corporation 30,000 shares of its common stock. The plaintiff claims that Morris received these shares without valid

consideration and that a fraud was thereby perpetrated on the corporation and its stockholders. The transaction complained of occurred in 1924. The Industrial Finance Corporation, a Virginia corporation, was formed in 1914 to organize Morris Plan banks, the idea of which originated with the defendant Morris. These banks conduct the business of making small loans to persons of proper character. Banks were organized in the larger cities, the practice of the company being to take about thirty per cent of the stock in each bank. In 1919, through the efforts of Morris, arrangements were made with the Studebaker Corporation for financing its wholesale sales, and in 1922 these were extended to cover retail transactions. The contract was cancelable upon sixty days' notice. By 1924 the Studebaker operations furnished by far the larger part of the company's earnings. However, both the Studebaker Corporation and the banks from which the company borrowed funds repeatedly warned the latter that its capital was deemed inadequate for the volume of business transacted and they insisted that additional capital be brought in. During this period Morris was a director of the company and also vice-president and general counsel. The active management of the business devolved upon him. At first his salary was $15,000 a year. In 1921 it was increased to $25,000 a year plus ten per cent of the net earnings in excess of ten per cent of the capital stock but not more than $100,000 in any one year. The result was that in 1923 Morris received $95,000 and in 1924 $125,000 by way of compensation from the company. The by-laws provided that the officers should serve at the pleasure of the board of directors, and as far as the record shows Morris had no employment contract covering a fixed period. The demands for more capital had become so insistent by May, 1924, that they could no longer be ignored. Morris then undertook to raise $2,000,000 by the sale of a contemplated issue of debenture stock to the defendant Markle, the president of the company. Markle declined. Several banking houses were next approached. They frowned upon the proposal that they purchase the new stock because of the poor dividend record of the company. Finally Morris went to the firm of E. B. Smith & Co., who suggested to him that the solution of the difficulty lay in the formation of a separate corporation to take over the Studebaker contract and all the liabilities which went with it. These bankers intimated that they might underwrite an issue of preferred stock of such a company under certain conditions provided that Morris himself would have a substantial stock interest which would insure the retention of his services in connection with the Studebaker business which he had done so much to develop. Twenty-five per cent of the common

stock was suggested by Morris as the amount of his participation, and the bankers said that this would be acceptable to them. Morris testified that he laid the matter before the executive committee of the company at a meeting on July 14, 1924; that he discussed the possible formation of a new corporation to take over the Studebaker contract, with fifty per cent of the common stock to go to the company, twenty-five per cent to the bankers and twenty-five per cent to himself, and that he was authorized to proceed with the negotiations along these lines. He stated also that the matter was presented to the board of directors on July 21, 1924. The minutes of these two meetings record merely that discussions as to new financing took place. Thereafter the project took more concrete form, and a tentative proposal was made by the bankers that they would purchase $4,000,000 of preferred stock in the new corporation provided the old company would subscribe for $1,500,000 of second preferred stock at par, the bankers to receive twenty-five per cent of the common stock and the old company to receive seventy-five per cent. As laid before the executive committee and the board of directors, this proposal was coupled with the condition that twenty-five per cent of the common stock should be owned by Morris, thus cutting down to fifty per cent the amount of common stock to be held by the old company. Opposition on the part of certain directors was encountered, especially as to Morris receiving twenty-five per cent of the common stock of the new corporation, and as a consequence it was arranged, with the approval of the bankers, that Morris would exchange this stock for twenty-five per cent of the common stock of the defendant company. Some dissatisfaction still persisted with respect to the participation of Morris, but eventually the board of directors at a special meeting on September 30, 1924, unanimously approved the entire proposal as thus modified. After further skirmishing with the bankers as to certain details the matter was closed. Final corporate action was taken by the board of directors on November 25, 1924. A resolution was adopted whereby — after recitals to the effect that Morris had brought about the new financing upon condition that he would receive fifty per cent of the common stock of the new company for himself and the bankers — it was voted that 50,000 shares of such stock be delivered to him, with the right in the defendant company to issue to Morris at a later date 30,000 shares of its own common stock in return for the 50,000 shares. The company afterwards exercised this option, so that Morris emerged with 30,000 shares of the common stock of the Industrial Finance Corporation as his profit or compensation. An annual meeting of the stockholders of the defendant company was held

on February 9, 1925. At this meeting all the transactions relating to the formation of the new corporation, including the issuance of the 50,000 shares of common stock to Morris, were unanimously ratified. The plaintiff's stock was so voted by its duly authorized proxy, and all other shares present voted similarly. The gravamen of the complaint is that the delivery of the shares to Morris constituted a gratuity to him, which the directors had no power to bestow; that he had performed no services beyond the scope of his duties as a corporate officer, for which he was receiving regular compensation, and that to this extent the transaction was a fraud upon the company and its stockholders. There is apparently no charge of actual fraud in the complaint. It is not alleged that Morris controlled his fellow-directors, or that they acted in bad faith or with any sinister motive. The relief demanded is that Morris be directed to return to the company the shares received by him, and that the other individual defendants, consisting of the directors who were present at the meeting of November 25, 1924, account to the company for their conduct and respond in damages. Subject to interference by the courts in cases of clear abuse, the directors of a corporation, acting as a body, have the right to fix the compensation of executive officers for services rendered to the corporation. The directors are the persons chosen by the stockholders to pass upon such matters, and ordinarily their decision as to the amount of compensation is final. The fact that the officer whose compensation is voted by the board is also one of the directors does not vary the rule. (*Bagley* v. *Carthage, W. & S. H. R. R. Co.*, 165 N. Y. 179; *Hirsch* v. *Jones*, 115 App. Div. 156; *Fitchett* v. *Murphy*, 46 id. 181, 185.) Under certain circumstances, however, the courts will take a hand in the matter at the instance of the corporation or of stockholders. Sometimes it is shown that the stock of the corporation is closely held; that the persons in control have intrenched themselves in the directorate, and that corporate profits in the guise of compensation are being distributed to the favored few, regardless of the true value of their services to the corporation. (*Carr* v. *Kimball*, 153 App. Div. 825; affd., 215 N. Y. 634; *Atwater* v. *Elkhorn Valley Coal-Land Co.*, 184 App. Div. 253; affd., 227 N. Y. 611; *Schall* v. *Althaus*, 208 App. Div. 103.) In other cases the vote of the interested director has been necessary to the passing of the resolution, or his presence has been necessary to make a quorum. (*Butts* v. *Wood*, 37 N. Y. 317; *Miller* v. *Crown Perfumery Co.*, 57 Misc. 383.) Various other situations involving clear oppression, bad faith or breach of trust by the directors have been presented, in which the courts have given redress. It was incumbent upon the plaintiff to bring the present case within one of these exceptions.

I am of the opinion that he has not succeeded in doing so. No clear abuse of power by the board of directors has been shown. Morris owned nothing like a controlling interest in the corporate stock. The board was a large and apparently representative one. The directors numbered twenty-one, including Morris himself, and it is neither alleged nor proved that any of the other twenty were under his control. The history of the negotiations, the insistence by the bankers that Morris personally should have a stake in the enterprise, the changes made later, the deliberations of the directors, the undoubted value of Morris' services — all these and other factors in the case lead to the conclusion that in voting for the delivery of the stock to Morris as his compensation, the directors did what they believed to be for the best interest of the company. Under all the circumstances I can conceive of no other motive or intention on their part. Even if it be true, as plaintiff contends, that Morris received compensation in excess of the value of his services, this, *without more,* would not in my opinion warrant judicial interference. It is not the business of a court to revise the judgment of directors and substitute its own conclusions for theirs. Moreover, the ratification by the stockholders precludes the plaintiff from now urging this point. (*Kranich* v. *Bach,* 209 App. Div. 52.) The plaintiff presses the argument that in negotiaing with the bankers Morris was doing work within the scope of his duties, for which he was being generously paid, and that, therefore, the action of the board in November in awarding him special compensation for past services was in effect the bestowal of a gift. I am unable to adopt this view. It does not appear that the employment of Morris by the company covered any fixed period. (*Douglass* v. *Merchants' Ins. Co. of N. Y.,* 118 N. Y. 484; *Reiss* v. *Usona Shirt Co.,* 174 App. Div. 181, 183.) He was evidently free to resign at any time and similarly the board of directors could have dispensed with his services at any time. (*Douglass* v. *Merchants' Ins. Co. of N. Y., supra.*) Consequently, it cannot be said that he was under a contractual obligation to continue in office and to perform these services for his ordinary remuneration. Nor can it be said that the extra compensation was for past services. Practically, from the outset of the negotiations it was clear that Morris expected additional compensation, and that the directors realized this to be his attitude and acquiesced. On September 30, 1924, long before the matter was brought to a conclusion, the board of directors by formal action agreed to the special compensation. All that was done on November 25, 1924, with reference to Morris to consummate what had been agreed upon between him and the board

some months earlier. It does not seem uncommon for an executive officer of a company, paid on an annual basis, to decide to sever his connection in the middle of the year and to go elsewhere, and for the directors to agree to increase his salary if he will stay. The power of the directors to make such an agreement for greater compensation cannot be questioned. (*Fraker* v. *Hyde & Sons*, 127 App. Div. 620.) So here, if the directors believed that the successful solution of this financing problem depended upon their coming to an agreement with Morris for additional compensation, in order to induce him to remain with the company and close the deal with the bankers, it seems to me that their authority to make such an agreement is clear. The question of the right of a board of directors, acting in good faith, to vote a bonus or extra compensation to an executive for past services is not presented for determination in the instant case. A second reason why plaintiff must fail is that it is estopped to maintain this suit, its own proxy having voted to approve the very transaction now under attack. The vote by proxy is as binding upon the stockholder as his own vote, except where the vote is cast in furtherance of a conspiracy or by collusion between the person holding the proxy and the wrongdoer. (Thomp. Corp. [3d ed.] § 974; *McClean* v. *Bradley*, 299 Fed. 379, 384.) The plaintiff seeks to avoid the estoppel by characterizing the solicitation of its proxy and the vote of ratification as the final act in a fraudulent scheme. This position, however, is inconsistent with the plaintiff's own disclaimer, in its reply brief, of any attempt to prove actual fraud. Indeed, as already indicated, the proof furnishes no adequate grounds for an inference of fraud or collusion. At the trial the defendants made a motion to dismiss the complaint at the close of the plaintiff's case, upon which motion decision was reserved. In their briefs, however, the defendants have asked that the case be decided upon all the evidence. It is, therefore, unnecessary to decide the earlier motion. The defendants' motions for judgment at the close of the entire case will be granted, with costs. Submit proposed findings of fact and conclusions of law.