HARRY E. BOVAY and KENYON D. WELLS, Trustees in Bankruptcy of Vicksburg Bridge & Terminal Company, a corporation of the State of Delaware,

<em>vs.</em>

H. M. BYLLESBY & COMPANY, a corporation of the State of Delaware, and FEDERAL SECURITIES CORPORATION, a corporation of the State of Illinois.

<em>New Castle, March</em> 25, 1940.

4

*Daniel O. Hastings* and *Caleb R. Layton, III,* of the firm of Hastings, Stockly, Duffy & Layton, for complainants.

*Aaron Finger,* of the firm of Richards, Layton & Finger, for defendant H. M. Byllesby & Company.

THE CHANCELLOR: The complainants, Harry E. Bovay and Kenyon D. Wells, are trustees in bankruptcy for *Vicksburg Bridge & Terminal Company,* a corporation of the State of Delaware. As such trustees, they are seeking to recover from the defendants certain specified large sums of money, amounting in the aggregate to more than $1,250,000; which the bill alleges were illegally and improperly paid to them from the funds of that corporation; and which said sums of money, therefore, fairly and justly belong to the corporation, for the benefit of its creditors.

The case is before this court on a demurrer to the complainants' bill. That bill is quite voluminous, but, in substance, alleges: That by an act, approved May 3, 1926, 44 *Stat.* 388, Congress granted to the Vicksburg Bridge & Terminal Company, a corporation of the State of Arkansas, and to its successors and assigns, the right to construct, maintain and operate a toll bridge and the approaches thereto across the Mississippi River, between the City of Vicksburg, Mississippi, and an opposite point in the State of Louisiana. Harry E. Bovay, one of the complainant trustees, organized that corporation, was its president, and the owner of all of its capital stock; and in order to procure the necessary funds to construct the bridge in question he entered into certain negotiations with the defendants on June 7, 1926. These negotiations resulted in certain agreements between Bovay and an associate and H. M. Byllesby & Company and Federal Securities Corporation, the defendants. By the terms of those agreements, the defendants were to advance the money to pay certain necessary expenses and to make certain monthly advances to Bovay and to an associate; and in partial consideration for said advances and payments Bovay and his associate were to use their best efforts in the promotion of two toll bridges across the Mississippi River, to be located at Natchez and Vicksburg, respectively. Under these agreements, Bovay and his associate were not only to endeavor to procure the proper Federal, State, County and Municipal authority to construct and operate such bridges when built, but, also, agreed to organize such corporation or corporations as might be necessary, without expense to the defendants, and under the laws of such state, as should be agreeable to them. Any such corporation so organized was to hold and own the bridge franchise, and was to provide for the issuance of two classes of common stock; one of which was to be voting stock and the other non-voting stock. Under their contract, the defendants were to receive two-thirds of the total stock issue of any such corporation and Bovay

was to receive one-third thereof. This was subject to the proviso, however, that Bovay was to receive 60% of the voting stock and the defendants were to receive the remaining 40%. The defendants, also, agreed that when the promotion work should be accomplished and the said corporate capital stock distributed they would complete the necessary financing to insure the construction of each of the contemplated bridges. When these agreements were made, the Arkansas corporation had already been organized and then held the franchise to build the Vicksburg bridge, but the plans for its construction were not approved by the War Department until December 16, 1927. After the happening of certain contingencies, which need not be mentioned, the defendant, nevertheless, agreed to purchase from the corporation, holding the bridge franchise, securities necessary to finance the project, at 90% of their par value. The promotion work was to be done within six months from the date of that contract, and it was to bind the parties for that period. At the expiration of that time, the defendants were given the option to cancel such contract or to continune it for an additional six months, as they might determine. The time limit provided for in the contract expired before the completion of the Vicksburg bridge, but the work was continued with the understanding between the parties that its provisions and obligations should remain in effect and be binding on all of them.

On December 20, 1927, the defendants organized the Vicksburg Bridge & Terminal Company under the corporation laws of the State of Delaware; and the complainants are now trustees in bankruptcy for that corporation. Its charter merely provided for the issuance of one class of capital stock, consisting of 60,000 shares of common stock, without nominal or par value.

On January 23, 1928, Bovay, as president of the Arkansas corporation, and apparently pursuant to corporate authority, executed a formal assignment to the Delaware cor-

poration of all the franchise rights relating to the bridge, originally granted to the Arkansas corporation by the Act of Congress of May 3, 1926.

During the latter part of January, or early in the month of February 1928, H. M. Byllesby & Company and Federal Securities Corporation, the defendants, refused to proceed further under their agreement of June 7, 1926, whereby Bovay was to receive 60% of the voting stock of the corporation, therein referred to. Negotiations finally resulted in a new agreement, dated February 10, 1928, whereby Bovay was merely to receive one-third of the total authorized capital stock of the Vicksburg Bridge & Terminal Company of Delaware, which had been organized by the defendants on December 20, 1927, and H. M. Byllesby & Company and Federal Securities Corporation were to receive the remaining two-thirds of the stock of that corporation in equal parts. That contract further provided that, in consideration of Bovay's surrender of the voting control of the bridge corporation, which had been given him in the original agreement of June 7, 1926, he was to be paid $123,666. The contract on which that allegation was based was attached to and composed a part of the bill. It recited that on the same day Bovay had entered into an agreement with the Vicksburg Bridge & Terminal Company of Delaware, by the terms of which he covenanted and agreed that, in consideration of the sum of $123,666 in cash and a certain other consideration "in stock paid to him by the said" bridge corporation, he would cause the defendants to make and execute a certain agreement with the said Vicksburg Bridge & Terminal Company of Delaware "to purchase certain securities of that corporation at and for a stated or fixed consideration." Bovay was paid the said sum of $123,666; $100,000 of which was to be paid to him for his own use and benefit, though $23,666 seems to have been for certain "promotional expenses," which the defendants insisted on paying through him. While the whole of the said sum of $123,666 was paid to Bovay in the first instance,

either by Byllesby & Company or by Federal Securities Corporation, on April 12, 1928, the Vicksburg Bridge & Terminal Company of Delaware reimbursed Byllesby & Company for the said sum so paid. That payment was alleged to have been unfair to the corporation, as the defendants alone were benefited by the greater part thereof.

The following provision was, also, inserted in the contract between Bovay and the defendants, dated February 10, 1928:

"This Agreement supersedes and cancels all previous agreements entered into between the parties hereto, with reference to the Vicksburg Bridge project, and by and between the parties hereto with the Vicksburg Bridge & Terminal Company, an Arkansas corporation."

The Arkansas corporation had assigned the bridge franchise to the Delaware corporation on January 23, 1928, but, by a proposal in writing made by Bovay to the Vicksburg Bridge & Terminal Company of Delaware, dated February 2, 1928, he offered: (1) to cause the Vicksburg Bridge & Terminal Company of Arkansas to assign the bridge franchise, granted by the Act of Congress of May 3, 1926, to the Delaware corporation, of the same name; (2) to cause the defendants to make a contract with the Delaware bridge corporation for the purchase from it of $5,000,000, principal amount, of its first mortgage 6% sinking fund bonds; $2,250,000, principal amount, of its 7% debentures, and 40,000 shares of its capital stock, consisting of 66⅔% thereof, for the total sum of $6,525,000. The proposed consideration for this offer was the payment to Bovay of $123,666 in cash, but in specified installments; the issuance to him of 33⅓% of the total capital stock of the Vicksburg Bridge & Terminal Company of Delaware, or 20,000 shares thereof, and the payment to him of $1,000 per month for services to be rendered from March 1, 1928 to the opening of the bridge for traffic. This offer made by Bovay to the Delaware bridge corporation, now in bankruptcy, was apparently accepted by it on February 2, 1928 by a written in-

strument signed in the name of the corporation by J. J. Shinners, its vice-president.

On February 2, 1928 an agreement was, also, entered into between the Vicksburg Bridge & Terminal Company of Delaware and the defendants, whereby they agreed to purchase bonds, debentures and stock, to be issued by said corporation, to the amount mentioned in the contract between Bovay and that corporation, and to pay therefor $6,525,000. This price was to be "net price free and clear of all expenses to the bankers, including all expenses  *  *  *  other than commissions paid or allowed by the bankers to dealers in securities." It was, also, provided in the same contract that the commitment of the bankers was contingent on the execution of contracts by the corporation for the construction of the bridge, agreeable to such bankers. When these alleged agreements were signed, Bovay had no control over the franchise originally held by the Arkansas corporation, nor did he have any control over the acts of the defendants in the matter of their agreement to purchase, at a discount, the securities of the bridge corporation of Delaware.

The agreement of February 10, 1928 between Bovay and the defendants, above referred to, also, provided that upon the completion of the corporate organization of the Bridge and Terminal Company of Delaware, the board of directors should consist of nine members. Four of these directors, including Bovay, were to be named by the defendants. That agreement further provided for the appointment of an executive committee, consisting of Bovay and two other persons; one to be named by each of the defendants.

On February 9, 1928 a special meeting of the board of directors of the Vicksburg Bridge & Terminal Company of Delaware was held in the City of Chicago. The minutes of that meeting show that Bovay, John J. Shinners and Philip R. Clark were elected directors of the corporation to take the place of the original directors who had been merely

selected for organization purposes. Shinners was an employee of H. M. Byllesby & Company, and subsequently became a vice-president of that company, and represented it in all matters connected with the Vicksburg Bridge & Terminal Company of Delaware. Clark was at that time the president of Federal Securities Corporation, the other defendant. At that meeting, J. H. Briggs, a vice-president of Byllesby & Company, and William G. Pohl, assistant treasurer of that company, were, also, elected directors of the Delaware bridge corporation. The officers of that corporation were Harry E. Bovay, president; John J. Shinners, vice-president; William G. Pohl, secretary and treasurer, and C. H. O'Reily, also an employee of Byllesby & Company, assistant secretary and treasurer.

A meeting of the stockholders of the Vicksburg Bridge & Terminal Company of Delaware was held on April 3, 1928. The minutes of that meeting recited that Shinners "the sole and only stockholder of the company, and the owner of 200 shares of its capital stock, voted and declared that the corporation should purchase through Bovay a certain bridge franchise and should pay therefor such consideration as the officers and directors of the company, in their sole discretion, should deem advisable." The same resolution offered at that meeting, also, authorized the officers and directors of the corporation to enter into the necessary contracts to carry out its purpose. The minutes further recited that "the officers and directors were authorized to dispose of the capital stock of the company, to fix the consideration therefor, and to borrow money, issue bonds and secure the same by deed of trust and mortgage upon any present and future property of the company." All of these proceedings were alleged to have been merely an attempt by the defendants, through their duly authorized employees, agents and officers, to effectuate agreements, theretofore reached by the promoters of the corporation among themselves, and to give the appearance of corporate authority. The minutes, also, show that a special meeting of the board of direc-

tors of the bridge corporation of Delaware was held on the same day, and shortly after the stockholders' meeting. From them, it appeared that Bovay, Shinners, Pohl, Clark and Briggs were present; that Bovay acted as chairman and Pohl acted as secretary; that the chairman offered to cause the Vicksburg Bridge & Terminal Company of Arkansas to assign to the Delaware bridge corporation, of the same name, the franchise granted by the Act of Congress of May 3, 1926, and to cause the defendants to purchase, for the price of $6,299,000, bonds in the principal amount of $5,000,000, debentures in the principal amount of $2,000,-000, and 39,800 shares of common stock. The consideration to be paid to Bovay by the Bridge & Terminal Company of Delaware was $123,666 in cash, $1,000 payable monthly, beginning March 1, 1928 to the date on which the bridge proposed to be built should be completed and opened to traffic, and 20,000 shares of common stock. It further appeared that the offer of Bovay was accepted by the unanimous vote of the directors, though he did not vote because of personal interest in the matter before the board. Notwithstanding the statements in the minutes to that effect, Bovay was not present at that meeting, and had no knowledge of it; and the remaining directors present were officers and employees of one or the other of the defendant corporations.

The reason for the reduction in the debentures to be issued from $2,250,000, as apparently originally contemplated, to $2,000,000 does not appear.

On April 12, 1928, the defendants deposited $6,347,-666.67 in the Continental National Bank & Trust Company of Chicago, to the credit of the Vicksburg Bridge & Terminal Company of Delaware. The following entries were made on the books of that bank:

| | |
|---|---|
| "Proceeds of First Mortgage Bonds, at 90, | $4,500,000.00 |
| Proceeds of Debentures, at 90 minus, | 1,799,000.00 |
| Interest accrued on Bonds and Debentures from March 1st, 1928, | 47,666.67 |
| Proceeds 200 shares of stock | 1,000.00" |

Further entries made at the same time were:

"Unamortized Debt Discount & Expense First Mortgage bonds $ 500,000.00
7% Debenture Bonds $ 201,000.00."

Neither of the defendants made any deposits, or otherwise paid the Vicksburg Bridge & Terminal Company of Delaware for the 39,800 shares of stock mentioned in the said resolution of April 3, 1928, though certificates therefor were issued to them, or to their nominees, on or about May 30, 1929. Certificates for 200 shares of this stock, which the corporate minutes of April 3, 1928, recited were owned by Shinners, were subsequently issued to Federal Securities Corporation.

The Delaware bridge corporation was unable to pay its outstanding obligations by an amount exceeding the whole amount which the complainants, as trustees in bankruptcy, seek to recover, including $199,800 for said shares of stock "at the price of $5.00 per share, as fixed by the board of directors of the corporation." The money deposited in the Continental National Bank & Trust Company of Chicago was the proceeds from the sale of the securities issued by the Vicksburg Bridge & Terminal Company of Delaware, pursuant to its alleged contract with the defendants, after deducting 10% therefrom. The defendants had negotiated for the sale of such securities prior to the receipt of the money and at and above the par value thereof, without incurring any substantial liability on their own account.

The minutes of the directors' meeting of the bridge corporation of Delaware, held on April 3, 1928, recited that a resolution was adopted, authorizing the officers of the company to execute and deliver a disbursement agreement between that company and the Continental National Bank & Trust Company of Chicago, to be dated as of March 1, 1928, "covering the disbursements of moneys of the company to be used in the construction of the proposed bridge at or near Vicksburg." An agreement was subsequently executed by John J. Shinners, as vice president. That agree-

ment provided, however, that the proceeds of said securities, amounting to $6,300,000, plus accrued interest, if any, should be deposited in said bank, to be paid out and expended by it, upon written orders, or engineers' certificates, "signed by two of the officers of the company and approved by an agent or agents of H. M. Byllesby & Company and/or Federal Securities Corporation," for the cost of the construction of said bridge and the expenses incident thereto and properly connected therewith. The same agreement, also, provided for "the reimbursement of any and all persons, firms or corporations who have (had) theretofore advanced money for corporate purposes of the company."

Upon the supposed authority of the said disbursement agreement, the disbursing agent improperly paid from corporate funds certain large sums of money, which will be hereafter set out in detail. It, also, paid certain other large sums of money which purported to be for salaries due corporate officers, who were, also, employees of the defendants. One of the amounts so paid purported to be for salary due William G. Pohl, as secretary-treasurer of the corporation. That amount was paid to Byllesby & Company and appropriated by it, though no such salary had ever been fixed by corporate authority. Other salaries paid were fixed by the board, and checks therefor were drawn and delivered to the payees, but were subsequently endorsed and paid to Byllesby & Company.

On September 1, 1932, at the instance of Byllesby & Company, a financial adjustment committee was formed for the Bridge & Terminal Company of Delaware, and one Mord M. Bogie was first employed by that committee at a salary of $500 per month, which was subsequently reduced to $250 per month. Salary checks for these sums were signed by officers of the corporation, who were, also, employees of Byllesby & Company, and such checks were delivered to the payees, but were subsequently endorsed to and collected by that company.

The interests of the defendants in organizing the Vicksburg Bridge & Terminal Company of Delaware were for the purpose of profit to themselves in marketing the securities of that corporation. The earnings from the operation of the bridge were at no time sufficient to pay the necessary expenses thereof, including the interest accruing on the bonds and debentures issued by the corporation, and there was a large deficit "before the corporation began the operation of the said bridge." It paid the interest on its debentures until March 1, 1932, and on its first mortgage bonds until September 1, 1933; but this was done "by the use of the capital funds and moneys borrowed upon the pledge of future earnings."

All of these facts are alleged in the bill, and copies of the contracts therein referred to are attached to and compose a part of it.

After the early part of February, 1928, the defendants at all times continued to control and operate the Vicksburg Bridge & Terminal Company of Delaware "as their own creature, for their own profit and advantage." Federal Securities Corporation was "to some extent subject to the domination and control of its more aggressive associate, the Byliesby Company," and, in fact, retired from active business about the month of June, 1929. Thereafter, the affairs of the bridge company "were managed, directed and controlled by" Byllesby & Company.

Based on the facts alleged, the complainants claim:

1. That at the time the contract was made for the sale to the defendants for $6,299,000 of bonds and debentures, in the amount of $7,000,000, issued by the Vicksburg Bridge & Terminal Company, and 39,800 shares of its no par stock; and likewise at the time the other alleged improper payments were made to such defendants from corporate funds, they occupied a fiduciary relationship toward that corporation, and, therefore, did not contract, or otherwise deal with it on equal terms.

2. That the terms of that, and other contracts made between them, were unfair to the corporation and to the great advantage of the defendants; and the various other payments to them from corporate funds were, in some instances, not authorized by corporate action, or were otherwise unfair to it, and in some instances even related to other transactions.

3. That such a fiduciary relationship existed between the parties is largely based on the contention that the defendants, either acting alone or in conjunction with Bovay, promoted the organization of the Vicksburg Bridge & Terminal Company of Delaware; that the proposed promotion plan was such that their relation to the corporation did not end upon its mere organization, and they, in fact, continued to control its actions when the resolution of April 3, 1928, was passed, and when the various payments complained of were made. The resolution in question purported to approve the prior contract for the sale of corporate bonds, debentures and stock to the defendants for $6,299,000.

In connection with the contract, providing that the defendants should name five of the nine directors of the Bridge & Terminal Company of Delaware and a majority of its officers and of its executive committee, the bill alleges:

1. "That this Agreement placed in the hands of the said defendants the control over the Board of Directors of said * * * corporation, and said defendants were in control at the time the agreements" were made between that company and the defendants.

2. "That at the time the various contracts complained of were made between the defendants and the Vicksburg Bridge & Terminal Company, and when the disbursement agreement and the payments made thereunder were, also, made, a majority of the nine members of the directors of that corporation were employees and directors of the defendants, and as such directors acted in the interest of the respective corporations represented by them; * * *."

The amounts which the complainants seek to recover from the defendants are:

1. $700,000, alleged to be discount on the bonds and debentures of the Vicksburg Bridge & Terminal Company of Delaware, purchased by the defendants from that corporation at 90% of their face value.

2. $123,666, paid by one of the defendants to Bovay to secure control of the Delaware corporation, and which was repaid to Byllesby & Company from the funds of the Bridge & Terminal Company on April 12, 1928.

3. $199,000, being the alleged value of 39,800 shares of no par stock of the Bridge & Terminal Company; the certificates for which were issued to the defendants, and which sum represented the value of that stock at $5 per share.

4. $22,644.38, reimbursement of promotion and pre-organization expenses incurred by said defendants, and consisting of salaries and expenses paid to Bovay and McCuing under the agreement of June 7, 1926.

5. $1,050.09, for traveling expenses of representatives of the defendants prior to the organization of the Delaware corporation.

6. $11,543.33, expended by the defendants prior to the organization of the corporation for highway and railway traffic reports for their own use and benefit in the investigation of the proposed bridge project and in subsequently marketing the said securities.

7. $27,225.53 paid to defendants to reimburse them for opinions on and approval of the securities issued, together with other legal services connected with the marketing thereof.

8. $18,301.67, to reimburse the defendants for expenditures made in connection with the project for the possible construction of a bridge at Natchez, Mississippi; and in no way connected with the business of the Vicksburg Bridge & Terminal Company.

9. $10,833.16, paid to Byllesby & Company on the representation that the same was due William G. Pohl, secretary-treasurer of the corporation, and an employee of Byllesby & Company, as a salary for his services, at the rate of $416.66 per month, beginning with March 28, 1928; such salary was never fixed by corporate authority, and, as a matter of fact, was never received by the said Pohl, but was appropriated by Byllesby & Company, to its own use.

10. $5,250, representing checks drawn for various corporate salaries, fixed by appropriate action, but which were endorsed by the payees therein, and delivered to Byllesby & Company, and cashed by it. All of these persons were, also, employees of the defendants, or one of them.

11. $7,250, representing checks of the corporation drawn to the order of Mord M. Bogie, as chairman of the financial adjustment committee, and, also, an employee of Byllesby & Company, which checks were, however, turned over to that company, and cashed by it.

Strictly speaking, the promoters of a corporation are not trustees, but they, nevertheless, occupy a fiduciary or *quasi* trust relation toward the corporation, when organized, and prior thereto toward those who have subscribed for its stock. *Henderson, et al., v. Plymouth Oil Co., et al.,* 16 *Del. Ch.* 347, 141 *A.* 197, *minority opinion; Old Dominion Copper Mining Co. v. Bigelow,* 203 *Mass.* 159, 89 *N. E.* 193, 40 *L. R. A.* (*N. S.*) 314; 1 *Fletcher Cyc. Corp.,* (*Per. Ed.*) § 192; 14 *C. J.* 253. This is because they create the corporation, and ordinarily mould its organization and policies. *Henderson, et al., v. Plymouth Oil Co., et al.,* 16 *Del. Ch.* 347, 141 *A.* 197, *minority opinion.* So long as promoters continue to occupy that relation to the corporation, the utmost good faith, open and fair dealing is, therefore, required of them in any transaction with it. *Henderson, et al., v. Plymouth Oil Co., et al.,* 16 *Del. Ch.* 347, 141 *A.* 197, *minority opinion; Old Dominion Copper Mining Co. v. Bigelow,* 203 *Mass.* 159, 89 *N. E.* 193, 40 *L. R. A.,* (*N. S.*) 314; 14 *C. J.* 253. Whether,

however, alleged promoters occupy that position at a particular time is a question of fact, depending upon the circumstances of each case. *Henderson, et al., v. Plymouth Oil Co., et al.,* 16 *Del. Ch.* 347, 141 *A.* 197, *minority opinion;* 14 *C. J.* 252. The burden of showing that relation rests on the person alleging it; but when it has been established the burden of showing that any contracts, or other transactions, with the corporation are in all respects fair to that organization rests on the promoters. *Henderson, et al., v. Plymouth Oil Co., et al.,* 16 *Del. Ch.* 347, 141 *A.* 197, *minority opinion.*

Perhaps, in most cases, a promoter ceases to occupy that relation when the corporation has been fully organized and its property, and the management of its business affairs, have been turned over to the officers and directors, who are its legally constituted corporate agents; but that is not necessarily the case. *Downey v. Byrd,* 171 *Ga.* 532, 156 *S. E.* 259, 72 *A. L. R.* 345; *Mason v. Carrothers,* 105 *Me.* 392, 74 *A.* 1030; 14 *C. J.* 253, 291. When the promotion plan merely contemplates the organization of the corporation and other acts to be done prior thereto, the duties of the promoters, and their consequent relation to such corporation, usually end upon its organization; but when the plan, also, contemplates the performance of subsequent acts by them, such as raising the necessary capital to enable the corporation to carry out its purposes, a different situation may arise. *Old Dominion Copper Mining Co. v. Bigelow,* 203 *Mass.* 159, 89 *N. E.* 193, 40 *L. R. A.* (*N. S.*) 314; *Downey v. Byrd,* 171 *Ga.* 532, 156 *S. E.* 259, 72 *A. L. R.* 345; *Mason v. Carrothers,* 105 *Me.* 392, 74 *A.* 1030; 14 *C. J.* 252, 286, *note.*

In finally organizing the corporation, under the latter circumstances, a clear duty rests on the promoters to provide it with an independent board of directors; a board, which, in dealing with such promoters, will act for the best interest of the corporation, and will not be dominated or

controlled by them. *Arnold v. Searing,* 78 *N. J. Eq.* 146, 78 *A.* 762; *Mason v. Carrothers,* 105 *Me.* 392, 74 *A.* 1030; *Erlanger v. New Sombrero Phos. Co.,* 3 *App. Cas.* 1218.

In *Mason v. Carrothers,* 105 *Me.* 392, 74 *A.* 1030, 1033, *supra,* the Supreme Court of that State, aptly said:

"It needs no argument to show that Barcus and Hallam were promoters of the corporation in the legal sense of the term. * * * The six incorporators who subscribed for only one share each of common stock had no real interest in the corporation, but were nominees of Barcus and Hallam, four being in their employ. They were in the corporation simply to represent and act for the promoters and to do their bidding, and their stock, if paid for at all, was doubtless paid for by the promoters. * * * The corporation was not only created but manned by the promoters; it was in fact the promoters in a corporate guise, and it is the privilege, as well as the power, of the court in equity to remove the mask."

Applying these principles to the facts alleged, it appears that the defendants organized the Vicksburg Bridge & Terminal Company of Delaware, entirely on their own initiative, and, in fact, without the consent of Bovay. That they occupied the position of promoters at that time can hardly be denied; nor did they cease to occupy that position on the mere organization of the corporation. Their clear purpose was to purchase the necessary securities which they intended the corporation to issue to finance its needs, and, with that end in view, largely manned it with their own officers and employees in order to control its actions. There are repeated allegations to that effect in the bill. In connection with these allegations, it is, also, alleged and admitted by the demurrer that, in authorizing the various contracts made by the defendants with the corporation, the persons named by them on the board acted in the interest of such defendants. In view of these admitted facts, they had a clear duty to contract and otherwise deal with the corporation on fair terms, and this must clearly appear from the facts alleged in the bill.

The defendants claim that, even if there were a fiduciary relation between them and the corporation, they were

bankers who were financing a new and untried venture, and, regardless of the alleged profits made by them, necessarily assumed no inconsiderable financial risk in purchasing the securities of the Vicksburg Bridge Corporation. They, also, claim that the fair inference from the allegations of the bill is that the shares of stock included in the contract of sale had no real value; and, particularly in view of business conditions existing in 1928, that none of the transactions between them were, in any sense, unfair to the corporation, or of an unusual nature. The facts alleged and admitted by the demurrer are the only facts before this court, and, whatever a full hearing might ultimately disclose, the absolute fairness of some of the transactions between the defendants and the corporation is not so clearly apparent as to require no explanation, whatever, by the defendants.

The alleged right of action against the defendants is a corporate right (4 *Pom. Eq. Jur.*, § 1096; see, also *duPont v. Standard Arms Co.*, 9 *Del. Ch.* 324, 82 *A.* 692; *Ackerman v. Halsey*, 37 *N. J. Eq.* 356; *Zane on Banks & Banking*, §§ 80, 81, 86), which is vested in its trustees by the provisions of the *Federal Bankruptcy Act*, § 47 (*a*) (2), 11 *U. S. C. A.* § 75 (*a*) (2); now § 70 (*a*) (5), 11 *U. S. C. A.* § 110 (*a*) (5). It is conceded, therefore, that if any such rights exist, the complainants are the proper persons to enforce them, primarily for the benefit of the corporation, but for the ultimate benefit of those who are entitled to its assets. *Frazier v. Zachariah*, 174 *Miss.* 378, 164 *So.* 893; *Hoskins v. Johnston*, 205 *Iowa* 1333, 219 *N. W.* 541; 8 *C. J. S.*, *Bankruptcy*, 1087, § 333; 7 *C. J.* 246; see, also, *Zane on Banks & Banking*, §§ 84, 86. In the case of an insolvent corporation, any such recovery naturally would be largely, if not entirely, for the real benefit of its creditors. *McCandless, Rec., v. Furlaud*, 296 *U. S.* 140, 56 *S. Ct.* 41, 80 *L. Ed.* 121; *Frazier v. Zachariah*, 174 *Miss.* 378, 164 *So.* 893; *Hoskins v. Johnston*, 205 *Iowa* 1333, 219 *N. W.* 541; 3 *Fletch. Cyc. Corp.*, (*Per. Ed.*) §§ 1177, 1180; see, also, *Zane on Banks & Banking*, § 86.

In some respects, the relation of promoters to the corporation organized by them is akin to that of corporate directors, though the precise scope of their duties is less definite and certain. *McCandless, Rec., v. Furlaud,* 296 *U. S.* 140, 56 *S. Ct.* 41, 80 *L. Ed.* 121. The complainants, therefore, contend that, in analogy to actions against unfaithful directors for corporate mismanagement, the correct theory on which any such recovery is based is that the corporate right sought to be enforced is an asset in the nature of a chose in action, and is not based on any real trust relation existing between the promoters and corporate creditors. *Killen v. Barnes,* 106 *Wis.* 546, 82 *N. W.* 536; *Fant v. Brissey,* 150 *S. C.* 15, 147 *S. E.* 632; *Fletch. Cyc. Corp., (Per. Ed.)* § 1180; *Zane on Banks & Banking,* §§ 84, 86. That may not be the apparent theory on which many, if not most, of the minmanagement cases are based [*Campbell v. Watson,* 62 *N. J. Eq.* 396, 50 *A.* 120; 3 *Fletch. Cyc. Corp., (Per. Ed.)* § 1180]; but in principle that would seem to be the correct theory. In fact, that seems to be conceded by the defendants. However that may be, for all practical purposes, it may be said that: "A trustee in bankruptcy represents both the bankrupt and his creditors, and has the same rights and may pursue the same remedies in behalf of creditors as they would have been entitled to if there had been no adjudication in bankruptcy." *Frazier v. Zachariah,* 174 *Miss.* 378, 164 *So.* 893, 895; 3 *Fletch. Cyc. Corp., (Per. Ed.)* § 1277. It is contended, however, that the corporate rights, if any, are purely legal rights, which can be adequately enforced in a court of law, and that this court has no jurisdiction over the subject-matter of the action. *Rev. Code* 1935, § 4367; *Clark v. Sipple, et al.,* 10 *Del. Ch.* 51, 84 *A.* 1. There are, undoubtedly, cases where courts of equity and courts of law have concurrent jurisdiction, though the primary rights violated are of a legal nature. *Emerson v. Gaither,* 103 *Md.* 564, 64 *A.* 26, 8 *L. R. A.* (*N. S.*) 738, 7 *Ann. Cas.* 1114; 1 *Pom. Eq. Jur.,* (3d *Ed.*) § 174A, *p.* 206. This is because the remedy at law is not adequate and complete.

*Emerson v. Gaither*, 103 *Md.* 564, 64 *A.* 26, 8 *L. R. A.*, (*N. S.*) 738, 7 *Ann. Cas.* 1114; 1 *Pom. Eq. Jur.*, (*3d Ed.*) § 174*A*, *p.* 206. Cases involving fraud are ordinarily in that class. 1 *Pom. Eq. Jur.*, (*3d Ed.*) § 174*A*, *p.* 206.

In *Flaherty v. Industrial Trust Company*, 20 *Del. Ch.* 403, 178 *A.* 586, this court, in recognizing that general rule, aptly said:

"Fraud lies in the field of the concurrent jurisdiction of law and equity. In equity it is the basis of affirmative, in law * * * of defensive, relief."

The alleged corporate rights sought to be enforced by the complainants are based on the frudulent breach of a fiduciary relation, whereby the defendants reaped material and unfair benefits and profits, at the expense of the corporation, which is now insolvent, and, therefore, largely at the expense of its creditors. *Old Dominion Copper Mining Co. v. Bigelow*, 203 *Mass.* 159, 89 *N. E.* 193, 40 *L. R. A.* (*N. S.*) 314; *McCandless, Rec., v. Furlaud*, 296 *U. S.* 140, 56 *S. Ct.* 41, 80 *L. Ed.* 121. It has frequently been pointed out that, since the days of Lord Hardwicke, equity has assumed jurisdiction in cases of this nature. *Emerson v. Gaither, Rec.*, 103 *Md.* 564, 64 *A.* 26, 8 *L. R. A.* (*N. S.*) 738, 7 *Ann. Cas.* 1114; *Bates Shirt Co. v. Waite*, 130 *Me.* 352, 156 *A.* 293, 297; *Citizens' Loan Ass'n. v. Lyon*, 29 *N. J. Eq.* 110; *Ackerman v. Halsey*, 37 *N. J. Eq.* 356; *Cosmopolitan Trust Co. v. Mitchell*, 242 *Mass.* 95, 136 *N. E.* 403; *Toledo Savings Bank v. Johnston*, 94 *Iowa* 212, 62 *N. W.* 748; *Charitable Corp. v. Sutton*, 2 *Atk.* 400; *Fletch. Cyc. Corp.*, (*Per. Ed.*) § 1271; see, also, *McCandless, Rec., v. Furlaud*, 296 *U. S.* 140, 56 *S. Ct.* 41, 80 *L. Ed.* 121. With the exception of *McCandless, Receiver, v. Furlaud, supra,* all of the cases above cited involved the unfaithful or fraudulent acts of directors, or such grossly negligent acts as to amount to a fraudulent breach of trust, but substantially the same principles are involved in this case. Furthermore, the defendants, undoubtedly, rendered some services of value to the corporation in financing it, and, whether their transactions with it were fair or otherwise, may, therefore, be entitled to a reasonable compen-

sation therefor, irrespective of the general rights of the complainants. *McCandless, Rec., v. Furlaud,* 296 *U. S.* 140, 56 *S. Ct.* 41, 80 *L. Ed.* 121; *Henderson, et al., v. Plymouth Oil Co.,* 16 *Del. Ch.* 347, 141 *A.* 197, *minority opinion.* Recognizing that possible right, the complainants have prayed for an accounting. In these circumstances, a court of equity has jurisdiction to grant any proper relief to which the complainants, as trustees, may be entitled. *McCandless, Rec., v. Furlaud,* 296 *U. S.* 140, 56 *S. Ct.* 41, 80 *L. Ed.* 121. True, the defendants point out that the various amounts sought to be recovered by the complainants are specifically set out in the bill, but that does not affect the application of these principles. See *Emerson v. Gaither,* 103 *Md.* 564, 64 *A.* 26, 8 *L. R. A.* (*N. S.*) 738, 7 *Ann. Cas.* 1114, *supra.* Whether, however, the complainants, as trustees of the bankrupt corporation, have a right of action, also requires the consideration of other important questions. The complainants' alleged rights, as trustees, are of a derivative nature, and, therefore, depend on the rights of the corporation represented by them, and whose assets it is their duty to administer, though perhaps largely for the ultimate benefit of creditors.

In most cases when contracts are made, or there are other transactions between a corporation and its promoters, and all the subscribers for its stock assent thereto, with full knowledge of the facts, it has no right of action against the promoters for any alleged unfairness in any such transactions. *Old Dominion Copper Co. v. Lewisohn,* 210 *U. S.* 206, 28 *S. Ct.* 634, 52 *L. Ed.* 1025; *Henderson, et al., v. Plymouth Oil Co.,* 16 *Del. Ch.* 347, 141 *A.* 197, *minority opinion; McCandless, Rec., v. Furlaud,* 296 *U. S.* 140, 56 *S. Ct.* 41, 80 *L. Ed.* 121; 14 *C. J.* 292, 293. This is because the subscribers are the real equitable owners of the corporation. In cases where the rights of stockholders are alone involved, the complainants do not deny that general rule. They apparently contend, however, that if the corporation is insolvent, when the alleged unfair transactions take place, and for

all practical purposes the creditors are, therefore, the only persons interested in its assets, the assent of stockholders, even if given, cannot be relied on to defeat corporate rights. In support of that contention they rely on *McCandless, Rec., v. Furlaud, supra.* The solicitors for the respective parties disagree, however, as to the real scope of that case, and whether it practically overrules *Old Dominion Copper Co. v. Lewisohn,* 210 *U. S.* 206, 28 *S. Ct.* 634, 52 *L. Ed.* 1025, which was expressly approved by our Supreme Court in *Henderson, et al., v. Plymouth Oil Co.,* 16 *Del. Ch.* 347, 141 *A.* 197. Four members of the United States Supreme Court took the position that the *McCandless* case could not be reconciled with the *Lewisohn* case, and dissented on that ground; but five members of the court, who constituted the majority, distinguished the *Lewisohn* case. It seems unnecessary, however, for me to consider that question, as the case before this court involves a very different state of facts.

The conclusion reached by the court in *McCandless, Receiver, v. Furlaud, supra,* was largely based on two propositions:

1. That promoters, who deal with the corporation unfairly and for their own benefits and profit, are chargeable as trustees.

2. That the extent to which the assent of all stockholders will relieve promoters from liability to the corporation, for dealing with it unfairly and for their own benefit and profit, depends both upon the nature of the wrong committed and the interest affected thereby.

In .that case the promoters illegally appropriated a large portion of the corporate assets to their own uses, so that it was either insolvent, or on the verge of it, at the very inception of its business life. The corporate stock, therefore, had little or no real value, and the court held that rights, for the ultimate benefit of the holders of bonds and notes, secured by mortgage on the property, could not be taken away by the actions of the holders of such stock in

participating in and consenting to the illegal acts of the promoters. Other distinguishing facts will, also, appear in the report of that case.

After certain allegations, which need not be considered, the bill alleges that the income from the operation of the bridge was at no time sufficient to pay the necessary operating and maintenance expenses, and the interest on the securities issued, so that " * * * a large deficit was left before the corporation began the operation of the said bridge." As I have already indicated, that allegation is not sufficient to bring the case within the principles announced by the majority of the court in *McCandless, Receiver, v. Furlaud,* 296 *U. S.* 140, 56 *S. Ct.* 41, 80 *L. Ed.* 121, *supra.*

It must be conceded that Bovay and the defendants were the only persons interested in the stock of the corporation when the alleged unfair contracts were executed, and when the other alleged improper and unfair payments were made from corporate funds. It must, also, be conceded that Bovay agreed that the corporation should sell to the defendants $7,000,000 worth of its bonds and debentures, at a discount of 10%, plus 39,800 shares of its no par stock. He agreed with the defendants to relinquish to them the control of the corporation holding the bridge franchise on the payment to him of $123,666; but the recitals in that contract show that such payment was intended to be made by the corporation, and from corporate funds. In fact, that payment seems to have been the real consideration for the assignment of the bridge franchise by the Arkansas Corporation to the Vicksburg Bridge & Terminal Company of Delaware. That Bovay assented to such payment from corporate funds even more clearly appears from his contract with the corporation, dated February 10, 1928. The fact, therefore, that he was not present at the directors' meeting of April 3, 1928, when such payment was authorized by the corporation, seems wholly immaterial. It is not denied that most of the various payments made to the defendants by the disbursing agent of the corporation for alleged expenses and

attorneys' fees, incurred in connection with the Vicksburg bridge project, were pursuant to the express directions of the contract between the corporation and that agent, dated March 1, 1928. The complainants contend, however, that even if that contract were within the fair scope of the resolution authorizing it, at least some of the payments provided for therein, or otherwise made, were wholly unfair to the Vicksburg Bridge & Terminal Company, and should be accounted for by the defendants because of their fiduciary relationship to, and control over, that corporation. So far as appears from the facts before this court, perhaps the fairness of several of the payments, for expenses incurred prior to the organization of the corporation, might be subject to question; but, however that may be, payments made for expenses incurred in connection with an entirely different bridge project would, undoubtedly, require some explanation by the defendants. Perhaps the same comment would, also, be applicable to the payments made to Byllesby & Company for salary claimed to have been due Pohl, for services rendered as secretary-treasurer of the corporation, though, so far as appears, no such salary had ever been fixed, or payment authorized by corporate authority.

From the facts alleged, it, therefore, does not appear that the complainants' right of action is wholly barred by the principles of estoppel, announced in *Old Dominion Copper Company v. Lewisohn*, 210 *U. S.* 206, 28 *S. Ct.* 634, 52 *L. Ed.* 1025, and in *Henderson, et al., v. Plymouth Oil Company*, 16 *Del. Ch.* 347, 141 *A.* 197.

The defendants contend, however, that in any aspect of this case the complainants' alleged rights are barred by laches. Perhaps that defense is ordinarily taken advantage of by proper pleading and proof, but if laches clearly appears on the face of the bill it can be taken advantage of by demurrer. *Martin v. Martin*, (*Del. Ch.*) 74 *A.* 864; *Bay Newfoundland Co. v. Wilson & Co.*, 24 *Del. Ch.* 30, 4 *A.* 2d 668; *Frank v. Wilson & Co.*, 24 *Del. Ch.* 237, 9 *A.* 2d 82. The equitable rule, relating to laches, springs from the well rec-

ognized elementary rule that "he who seeks equity must do equity." *Bay Newfoundland Co. v. Wilson & Co.*, 24 *Del. Ch.* 30, 4 *A.* 2d 668; *Frank v. Wilson & Co.*, 24 *Del. Ch.* 237, 9 *A.* 2d 82.

Laches is not ordinarily based on the mere delay in asserting alleged rights, but on delay that works a disadvantage to another after notice of the invasion of such rights. *Bay Newfoundland Co. v. Wilson & Co.*, 24 *Del. Ch.* 30, 4 *A.* 2d 668; *Federal United Corp. v. Havender*, 24 *Del. Ch.* 318, 11 *A.* 2d 331. When, therefore, a court sees negligent and unreasonable delay on one side, after notice, and injury therefrom on the other, it is usually a ground for denial of equitable relief, on the ground of laches. *Bay Newfoundland Co. v. Wilson & Co.*, 24 *Del. Ch.* 30, 4 *A.* 2d 668; 4 *Pom. Eq. Jur.*, (4th Ed.) § 1442.

Statutes of limitations, strictly as such, are not binding on courts of equity, but, in the absence of peculiar circumstances, clearly making the application of any such rule inequitable and unjust, it seems that the time fixed by the analogous statutory provision, barring a right of action in a court of law, will ordinarily be followed in determining whether the complainant has been guilty of laches. *Wright v. Scotton*, 13 *Del. Ch.* 402, 121 *A.* 69, 31 *A. L. R.* 1162; *Martin v. Martin*, (*Del. Ch.*) 74 *A.* 864; *Bay Newfoundland Co. v. Wilson & Co.*, 24 *Del. Ch.* 30, 4 *A.* 2d 668; *Dodd, Adm'r., v Wilson*, 4 *Del. Ch.* 399; *Gootee v. Riggin*, 12 *Del. Ch.* 91, 107 *A.* 452. This is because equity will generally refuse to aid in the recovery of stale demands. *Wright v. Scotton*, 13 *Del. Ch.* 402, 121 *A.* 69, 31 *A. L. R.* 1162; *Martin v. Martin*, (*Del. Ch.*) 74 *A.* 864; *Perkins v. Cartmell*, 4 *Har.* 270, 42 *Am. Dec.* 753.

The most recent pronouncement by our Supreme Court on the question of laches is in *Federal United Corporation v. Havender*, 24 *Del. Ch.* 318, 11 *A.* 2d 331, *supra*.

In applying these principles, we must bear in mind, however, that a complainant cannot be charged with any

unreasonable delay until he has knowledge of the alleged fraud, unless his lack of knowledge is due to his own culpable neglect. *Cahall v. Burbage*, 13 *Del. Ch.* 299, 119 *A.* 574; see, also, *Lieberman v. First National Bank*, 8 *Del. Ch.* 519, 2 *Pennewill* 416, 45 *A.* 901, 48 *L. R. A.* 514, 82 *Am. St. Rep.* 414; *Bailey v. Glover*, 21 *Wall.* 342, 22 *L. Ed.* 636, and cases above cited.

A Chicago bank was the disbursing agent of the Vicksburg Bridge & Terminal Company, and on April 12, 1928, the defendants deposited in that bank, to the credit of the bridge corporation, the amount of the agreed price of the bonds and debentures, purchased by them under their contract of February 19, 1928, which was acted on by the board of directors on April 3d of that year. On the same day, Byllesby & Company was repaid from corporate funds $123,666, previously paid by it to Bovay. For reasons, already pointed out, neither of these transactions, whether fair or otherwise, has any bearing on this phase of the case, and I merely mention them because the dates when they occurred are alleged in the bill. No other dates appear, though the case has been argued on the theory that the other payments which were questioned were made somewhere about the same time. Receivers were appointed for the Vicksburg Bridge & Terminal Company of Delaware on January 30, 1934; so the payments in question must have been made before that date.

On February 3, 1934, an involuntary petition in bankruptcy was filed, and on February 12th of the same year the corporation filed a voluntary petition. On August 1, 1934, or some six months after the inception of the bankruptcy proceedings, reorganization proceedings were started under *Section 77B* of the *Bankruptcy Act*, 11 *U. S. C. A.* § 207. The complainants were appointed trustees for the bankrupt corporation November 30, 1934, and this bill was filed February 1, 1939, or more than four years thereafter, and more than five years after receivers had been appointed for the corporation. If the alleged unlawful payments were

made at or about April 3, 1928, which seems to be conceded by the complainants, the bill was filed almost eleven years thereafter.

This case is before the court on a demurrer to the complainants' bill, and the question is whether their right of action is barred by laches. When there is considerable apparent delay in bringing a suit, good pleading requires that any inferences in favor of the defendant should be excused by the allegations of the bill. This is ordinarily true when such delay exceeds the analogous statutory period of limitations governing actions in a court of law. *Kelley v. Boettcher*, (8 *Cir.*) 85 *F.* 55; *Martin v. Martin*, (*Del. Ch.*) 74 *A.* 864; *Wright v. Scotton*, 13 *Del. Ch.* 402, 121 *A.* 69, 31 *A. L. R.* 1162; 4 *Pom. Eq. Jur.*, (*4th Ed.*) §§ 1441, 1457; 5 *Pom. Eq. Rem.*, (*2d Ed.*) § 2109; *Story's Eq. Pl.*, §§ 503, 751; 21 *C. J.* 401. The complainants recognize that rule, and seek to excuse their delay in bringing suit by the following allegations:

(1) By the use of capital funds and moneys borrowed on the pledge of future earnings, the Bridge & Terminal Company of Delaware continued to pay interest on its debentures up to and including March 1, 1932, and on its first mortgage bonds up to and including September 1, 1933. None of its creditors, or the minority stockholders, therefore, had any knowledge of the fraudulent practices, alleged in the bill, prior to the institution of the receivership proceedings, and until August 24, 1934, when the report of an auditor, appointed by the court having jurisdiction over those proceedings, was filed.

(2) The institution of any action on behalf of the corporation was delayed awaiting the conclusion of an examination of the bankrupt corporation, and an investigation of its affairs, by a special master appointed in the reorganization proceedings under *Section 77B* of the *Bankruptcy Act*, 11 *U. S. C. A.* § 207; and, also, because "the long continued illness of the presiding Judge of the said court,

having jurisdiction of the proceedings, prevented his authorization at an earlier date."

(3)   On the 29th day of June, 1936, a similar action was brought by the complainants in the United States District Court, having charge of the reorganization proceedings in bankruptcy. That case was subsequently appealed to the United States Circuit Court, (5 *Cir.*) 88 *F.* 2d. 990, which held that the lower court had no jurisdiction over the action. This opinion was handed down March 18, 1937, and the case was then discontinued.

These allegations alone do not excuse the complainants' delay, even if the corporation, or its representatives or creditors, were unaware of the alleged frauds until August 24, 1934.

Conceding that there might be cases where another action in some other court or jurisdiction would excuse an apparent delay in bringing suit (4 *Pom. Eq. Jur.*, (*4th Ed.*) § 1455; 21 *C. J.* 210; *Colwell v. Miles,* 2 *Del. Ch.* 110), the opinion of the Circuit Court of Appeals, holding that the United States District Court in Mississippi did not have jurisdiction over the action brought in that court, was handed down March 18, 1937, while this suit was not brought until February 1, 1939. If the long continued illness of the presiding judge of the United States District Court prevented him from signing an order, authorizing this suit, prior to February 1, 1939, the complainants could have requested the assignment of some other judge to consider that question.

That there was negligent delay in bringing this suit is therefore apparent, and if it in no way affected the position of the parties, that does not appear from the allegations of the bill.

For the reasons above given, the demurrer to this bill must be sustained on the ground of laches, and an order to that effect will be entered.