IDA G. BLISH,

Complainant Below, Appellant,

*vs.*

THOMPSON AUTOMATIC ARMS CORPORATION, a corporation of the State of Delaware, MATTHEW J. HALL, THOMAS A. KANE, MORTIMER S. GORDON, EUGENE D. POWERS, RUSSELL MAGUIRE, RUSSELL MAGUIRE & CO., INC., a corporation of the State of New York, and AUTO-ORDNANCE CORPORATION, a corporation of the State of New York,

Defendants Below, Appellees.

*Supreme Court, On Appeal, December 7, 1948.*

*Issac D. Short, II,* and *John T. Trimble,* of New York City, for appellant.

*Clarence A. Southerland,* of the firm of Southerland, Berl & Potter, and *Wolfgang S. Schwabacher, Sydney C. Winton* and *Robert L. London,* all of New York City, for Thompson Automatic Arms Corporation, Russell Maguire, Russell Maguire & Co., Inc., Eugene D. Powers and Auto-Ordnance Corporation.

RICHARDS, C. J., TERRY and CAREY, JJ., sitting.

TERRY, Judge, delivering the opinion of the court:

This is an appeal from a final decree entered by the Chancellor on the thirteenth day of March, 1942, dismissing the bill of complaint of Ida G. Blish, a stockholder of Thompson Automatic Arms Corporation, a corporation of the State of Delaware, called TAAC, against TAAC, Russell Maguire, Russell Maguire & Co., Inc., a corporation of the State of New York, called Maguire & Co., Eugene D. Powers, Thomas A. Kane, Mortimer S. Gordon, and Matthew J. Hall. Service of summons was made on defendant TAAC, and defendants Russell Maguire, Maguire & Co., and Eugene D. Powers appeared by their solicitors. Defendants Thomas A. Kane,

Matthew J. Hall and Mortimer S. Gordon were not served with process and did not appear in this action.

In 1941 TAAC was merged with Auto-Ordnance Corporation, a corporation of the State of New York, called AUTO and on December 8, 1941 AUTO, by order of the Chancellor, was made an additional party and permitted to adopt as its answer to the bill of complaint the answers of other defendants theretofore filed.

The action below was a stockholder's suit brought by the complainant to cancel certain shares of stock of TAAC theretofore issued to defendants Maguire & Co., Eugene D. Powers, Matthew J. Hall, Mortimer S. Gordon and Thomas A. Kane and for the recovery of certain sums alleged to have been unlawfully paid by TAAC for the personal benefit of defendant Maguire, President of TAAC, together with allegations of mismanagement by Maguire of corporate affairs.

The bill of complaint filed below may be divided into two parts: First, allegations charging the illegal issuance of many shares of TAAC stock, which the complainant contends should be ordered cancelled. In this category fall the following shares issued to the following persons: 3,500 shares issued to Maguire & Co., on March 14, 1939; 116,400 shares issued to Maguire & Co., on July 21, 1939; 3,600 shares issued to Thompson and Kane on July 21, 1939; 9,750 shares issued to Powers, Kane and Gordon on July 21, 1939; 20,000 shares "subscription" issued to Maguire & Co. at different periods beginning in March, 1939. Second, allegations charging mismanagement of the affairs of TAAC by Maguire.

The complainant below is the widow of Commander John Blish, United States Navy, who was the inventor of the basic principle of a sub-machine gun known in the field of armaments as the "Tommy Gun." In 1916 Commander Blish and the complainant, being joint owners of the basic patents, incorporated a New York company under the name

of Auto-Ordnance Corporation. They assigned the basic patent to AUTO and received in exchange 1250 shares of its original authorized capital stock. Upon the death of the Commander in 1919 his shares were distributed to the complainant, his children and to two other relatives.

In the early years of corporate existence Commander Blish, together with Brigadier General John T. Thompson, his son Colonel Marcellus H. Thompson, and Colonel George H. Harvey, contributed their technical experience and patents to the development of the main product of the company, the "Tommy Gun," and Thomas Fortune Ryan, a prominent New York financier, furnished the corporate funds for experimental and manufacturing purposes.

General Thompson and Ryan died prior to 1939. Colonel Marcellus H. Thompson succeeded his father in AUTO's corporate affairs and the Guaranty Trust Company of New York, called Guaranty, became executor of the Ryan Estate.

From corporate inception until 1939 the joint efforts of those in charge met with many disappointments. AUTO, until 1939, had not commenced the manufacture of guns. On the other hand, in 1921 the Colt Firearms Company manufactured for AUTO 15,000 "Tommy Guns" and from 1922 until 1939 AUTO's entire corporate activity was spent in liquidating these guns upon the open market. Sales did not meet expectations, as in January, 1939 approximately 4500 guns remained unsold. These guns, together with tools, jigs, cutter and fixtures (the patents having long expired) constituted the entire corporate assets of the company.

AUTO from time to time had issued stock to Ryan and others for alleged debts due from the corporation and for improvement patents, so that in January, 1939 there was outstanding, out of an authorized capital stock of 40,000 shares, a total of 25,630 shares, which were owned as follows:

Guaranty Trust Company of New York, as Executor of
the Last Will and Testament of Thomas Fortune Ryan,
deceased ............................................................................ 18,505 shares
Marcellus H. Thompson ............................................. 5,000 "
Ida G. Blish, complainant ........................................ 1,325 "
Sarah Blish ................................................................ 50 "
John Blish ................................................................. 50 "
John Lyman Blish ..................................................... 50 "
Meady Shields Blish .................................................. 50 "
Evelyn S. Thompson ................................................. 100 "
Dorothy M. Thompson .............................................. 100 "
Estate of Dorothy H. Cobb ....................................... 50 "
Madam Jean de Gennes ............................................. 25 "
Estate of George Ed Smith ....................................... 325 "

Guaranty, as executor, held a majority of the shares outstanding. In addition, it held promissory notes due the Ryan Estate of approximately $1,090,000, together with interest and a chattel mortgage covering AUTO's entire assets.

In January, 1939 the corporate picture of AUTO was one of despair. It was in point of fact insolvent. If AUTO was to continue, new capital had to be obtained or some type of reorganization was imperative.

Upon the death of Ryan, Colonel Thompson, President of AUTO, apparently realized that an interruption would take place in the company's future development, as Guaranty would assume control of the corporation, which in turn would present a hopeless situation insofar as the minority stockholders of AUTO were concerned; thus, Thompson endeavored to obtain new capital in order to liquidate the Ryan Estate indebtedness long prior to January, 1939. In fact, as far back as 1935, Thompson engaged in a series of conferences with Matthew J. Hall, then Vice-President of Automatic Arms Manufacturing Company, with the thought that he could interest Hall in participating with him in raising new capital in order to purchase the majority interest in AUTO held by Guaranty, settle AUTO's debts, reorganize and reconstitute it so that its business might be continued; otherwise, the minority stock would be worth-

less, since the total assets were not worth in 1935 more than approximately $400,000, which represented about 1/5 of the indebtedness to the Ryan Estate.

Thompson and Hall, as a result of their conferences, endeavored to interest others in their plan of reorganization. Discussions were had with Savage Arms Company, Remington Arms Company, Hallgarten & Company, Fenner & Beane, Ungerleider, Van Alstyne, Noile & Company, Cohu & Company, and many other corporations and financial institutions in New York, Detroit and Washington. Each discussion ended in a refusal to invest.

In January, 1939, Hall conferred with Russell Maguire, of Maguire & Co., an underwriter and dealer in securities in New York City, relative to financial assistance for AUTO. A summary letter was given Maguire, after which Hall arranged a meeting with Maguire, Colonel Thompson and Thomas A. Kane, AUTO's general counsel. Repeated conferences were held which resulted in an understanding between Thompson, representing the minority stockholders, and Maguire to form a new corporation to manufacture and sell the "Tommy Gun." The new corporation was to acquire all of the outstanding stock of AUTO, including the complainant's stock and the 18,505 shares of AUTO stock, together with the promissory notes and the chattel mortgage securing the same, held by Guaranty.

As to the compensation that Maguire & Co. was to receive, it was suggested that it take an option from Guaranty on the Ryan shares and indebtedness and sell the same to a new corporation to be organized at a stepped-up price. The understanding further provided that Maguire would enter into an underwriting agreement for the purchase of 300,000 shares of the new corporation's stock at $2.00 per share and receive an option of an additional 80,000 shares, and that, when the new corporation acquired 100% of the minority stock of AUTO, they (Thompson and Maguire) would cause the new corporation to cancel AUTO's indebted-

ness, dissolve it, and continue to operate as AUTO's successor. The understanding further provided for the organization and capitalization of the new corporation, for the determination of its executive personnel, its officers' compensation, and the composition of its board of directors.

Maguire called to see Mr. Van Vleck, a vice-president of Guaranty in charge of the Ryan Estate. Their negotiations lasted for a considerable time. Finally, Van Vleck agreed to sell the Ryan holdings (stock and indebtedness) for $529,000, but insisted the transaction be with the new corporation. On February 2, 1939 the tentative results of the negotiations were summarized in a written offer to Guaranty from Thompson along with Maguire's commitment to underwrite the stock of the new corporation.

In February Thompson and Kane, his attorney, conferred with the complainant and outlined to her in detail all of the features of the agreement between Thompson and Maguire, including the organization of the new corporation, the underwriting agreement and the purchase from Guaranty of the Ryan holdings. The complainant was further advised that she would receive stock in the new corporation at a proper ratio for the shares that she then held in AUTO.

Thompson Automatic Arms Corporation, the new corporation, was incorporated under the laws of the State of Delaware on the 3rd day of March, 1939, with an authorized capital stock of $500,000. At the first meeting of the directors, Thompson was elected president, C. Leonard Corbitt was elected vice-president, and Margaret Dillon was elected secretary-treasurer.

On March 13th the complainant delivered her 1325 shares of AUTO to Powers, counsel for Maguire, and on March 14, 1939 she received in exchange 19,110 shares of TAAC stock.

Guaranty's insistence that it sell the Ryan Estate holding to TAAC rather than to Maguire nullified that portion

of the agreement between Thompson and Maguire relating to their theory of compensation, as their profit was to be derived from the sale of the Ryan holdings by Maguire to TAAC at a stepped-up price. Maguire, therefore, insisted that he be paid a reasonable amount to compensate him for his services to TAAC in obtaining the Guaranty contract, and on March 14, 1939 the directors of TAAC found Maguire's services in this respect to be worth $3500 and authorized the issuance of 3500 shares of TAAC's stock to him in payment thereof.

On March 21st the final agreement was signed between Guaranty and TAAC for the sale of the 18,505 AUTO shares, the AUTO notes of over $2,000,000 (principal and interest) and the chattel mortgage securing the notes for the aggregate amount of $529,000, payable in two equal installments on July 21st and September 21, 1939.

A stockholders' meeting was called for May 9, 1939, and under Paragraph 11 of the notice the following purpose was stated:

"Confirming and ratifying the issuance and delivery of 3500 shares of stock of this corporation to Russell Maguire & Co., Inc., in consideration of its services in connection with the negotiations looking toward the execution of the final contract with Guaranty Trust Company and Auto-Ordnance Corporation."

It appears that the complainant was not only present at the May 9th stockholders' meeting, but joined with all other stockholders in expressly approving the authorization and issuance of these shares (3500) to Maguire & Co.

On March 29, 1939, TAAC entered into an underwriting agreement with Maguire & Co. Under this agreement Maguire & Co. agreed that it would purchase or find purchasers for 300,000 shares of TAAC stock at $2.00 per share net to TAAC after registration of the shares with the Federal Securities Exchange Commission, called SEC. The offering price was fixed at $3.00 per share, leaving a gross spread of $1.00 per share or $300,000 for Maguire & Co. Maguire

& Co. was also given an option to purchase 64,000 additional shares upon the following conditions: If purchased on or before June 30, 1940, $3.50 per share. If purchased on or before June 30, 1941, $4.00 per share, and, if purchased on or before June 30, 1942, $4.50 per share.

Certain expenses incidental to the organization of TAAC and the registration of its shares had to be met. TAAC was without funds. Maguire agreed to loan to the new corporation $20,000 against a note convertible at his option into the stock of the new corporation at the rate of $1.00 per share. This offer was refused as it was thought the new corporation should not be bound with indebtedness in its formative stages. Maguire then agreed to purchase 20,000 shares of the new corporate stock at $1.00 per share. However, he reserved the right to refuse to purchase any portion of the shares, the sale of which were not needed for current expenses. A subsequent agreement to this effect was signed simultaneously with the underwriting agreement of March 29th.

Upon the signing of the underwriting agreement TAAC retained Eugene D. Powers, Maguire's counsel, and Mortimer Gordon, a New York attorney, who specialized in SEC registrations, to assist Thomas A. Kane, TAAC's general counsel, in preparing the registration statement. TAAC's board of directors approved the registration statement on May 19, 1939, and filed the same with the SEC on May 23rd. The SEC issued a deficiency letter on June 14th, requiring many amendments. The letter reflected that TAAC had no more chance of success than its predecessor, AUTO, and would in all probability remain a liquidating enterprise.

Gordon, who had been employed as an adviser to Powers and Kane, was retained to work actively in preparation of the amendments, which were filed on July 5th.

Thompson, Kane, Hall, Gordon and Powers, subsequent to July 5th, conferred with officials of the SEC. It was

during this conference that it became apparent to all that registration could not be reasonably contemplated in time for the financing of the Guaranty contract through the public sale of TAAC stock.

Maguire and Thompson conferred with Van Vleck of Guaranty with the hope of having extended the time for payments under the Guaranty contract. Their requests in this respect were refused.

TAAC officers after receipt of the deficiency letter of June 14th, and without making their intentions known to Maguire & Co., conferred with others in an effort to obtain an alternative method of financing. They approached the Morris Plan Bank of New York, the Great Neck Trust Co., Atterbury, Oscar J. Perkins, Chemical Bank and Trust Co., National City Bank, and the Bank of Manhattan Co. On July 10th TAAC's negotiation with Oscar J. Perkins had advanced to a point where TAAC had given a written commitment to Perkins offering him 150,000 shares of TAAC stock as compensation for his services in raising the necessary funds needed under the Guaranty contract. On July 12th, Maguire & Co. learned of TAAC's endeavors to obtain alternative financing. Maguire immediately conferred with Thompson and pointed out to him that Maguire & Co. anticipated a profit of $150,000 from the public offering of TAAC stock, and that it would suffer damages if its agreement with TAAC was arbitrarily abandoned by TAAC.

Beginning on July 12th and continuing through July 18th, Thompson, Kane and Gordon representing TAAC, negotiated with Maguire the terms of an agreement covering private financing. Many proposals and counter-proposals were made. Maguire on July 12th, after conferring with Thompson, Kane and Gordon, approached the Marine Midland Trust Company in reference to private financing. The bank concluded that the combined assets of TAAC and AUTO, including a government order to AUTO of 951 guns

in the aggregate amount of $439,000 did not warrant a loan of $539,000; that, if a loan was to be considered, additional collateral of $200,000 would have to be given.

During TAAC's negotiations with Maguire, Thompson, Kane and Gordon continued their independent efforts to raise the necessary funds to meet the Guaranty contract from other sources. Each endeavor met with the same difficulty; that is, AUTO's assets, together with the government contract, did not provide the security demanded. Gordon finally suggested that, if Maguire would unconditionally subscribe to 100,000 shares of TAAC stock at $2.00 per share to be taken up within ninety days and waive *pro tanto* the provisions of the March 29th agreement requiring prior effective registration, he (Gordon) thought that he could interest a bank in making the loan. Under this plan Maguire was to receive as compensation 15,000 shares of TAAC stock. An agreement to this effect was signed by TAAC and Maguire & Co. on July 15th. Gordon was unsuccessful in his efforts to obtain a loan under this plan.

On July 17th Maguire renewed his negotiations with Marine Midland Trust Company, called Marine. Mr. Pharis, a vice-president of Marine, refused to grant a loan under the provisions of Maguire & Co's. July 15th agreement with TAAC. However, Marine did agree to consider a further proposal if Maguire would put up $100,000 in cash with the bank as additional collateral.

Maguire met with the directors of TAAC on July 18th. He advised them that he could not go firm at that time, as he had not as yet concluded arrangements with Marine. He suggested the directors close with anyone that could go firm, in which event he offered to release all claims he might have under the agreement of March 29th for 35,000 shares of TAAC stock. The directors, before adjournment, authorized Thompson and Kane to conclude an agreement for financing with Maguire or anyone else and to go as high as 225,000 shares of TAAC stock as compensation, if necessary.

Maguire was notified by Marine on the afternoon of July 18th that it would make the loan of $539,000 to TAAC on the basis of Maguire's pledging $100,000 additional collateral with the bank. Maguire immediately notified the directors of TAAC that he was prepared to go firm.

Thompson, Kane and Gordon, representing TAAC, immediately began negotiations with Maguire concerning the terms of an agreement to be entered into between TAAC and Maguire & Co. A final agreement was reached on July 18th, under which Maguire & Co. undertook to raise the $539,000 in time for the Guaranty closing on July 21st. Under this agreement Maguire & Co. released all claims that it might have under the agreement of March 29, 1939, including its option on 64,000 shares. Further, it obligated itself unconditionally to take the balance of the 20,000 subscription shares within sixty days from July 18th, its obligation under the subscription having expired June 24, 1939, at which time it had taken and paid for 7500 shares. As compensation for these promises Maguire & Co. was to receive 116,400 shares of TAAC stock.

The directors of TAAC were notified on the evening of July 18th of TAAC's agreement with Maguire & Co. They individually approved the agreement without holding a formal meeting. The stockholders in special meeting on July 19th, upon being informed as to the details of the July 18th agreement, passed the following resolution:

"Resolved that the company issue to Russell Maguire & Co., Inc., 116,400 fully paid and non-assessable shares of the capital stock of the company in consideration of services to the company in connection with the financing of the company, the execution of the agreement of July 18, 1939, and the cancellation of all agreements between Russell Maguire & Co., Inc. and the company, with the exception of the subscription agreement.

"Further Resolved that the appropriate officers of the company be and they hereby are authorized to issue certificates for 116,400 fully paid and non-assessable shares of the company, affix the corporate seal thereto and deliver the same to Russell Maguire & Co., Inc."

At the same stockholders' meeting on July 19th the chairman stated that the directors had advised him that in their opinion Colonel Marcellus H. Thompson and Thomas A. Kane should receive 3600 shares of TAAC stock for their services in reference to the Guaranty contract. After considerable discussion and upon motion duly made, seconded and carried the following resolution was adopted:

"Resolved that the company issue and deliver to Messrs. Col. Marcellus H. Thompson and Thomas A. Kane 3600 fully paid and non-assessable shares of the capital stock of the company in consideration of services rendered to the company."

This resolution was followed by a resolution directing the proper officers of the company to issue and deliver the shares to Thompson and Kane. The minutes establish that Thompson, Kane and Maguire left the meeting when the respective resolutions were passed involving their respective shares.

A directors' meeting followed the stockholders' meeting of July 19th. Those present were Thompson, Kane, Jenks, Knight, Jr., and Swafford. The secretary (Kane) produced a waiver of notice signed by all the directors. The chairman (Thompson) then outlined to the directors the terms of the July 18th contract with Maguire & Co., asked for and obtained unanimous approval to close the loan with Marine. Thompson then stated to the directors that Maguire & Co. had performed valuable services to TAAC in connection with the financing of the corporation and the procuring of the loan from Marine. Thompson further stated that Maguire & Co. had offered to accept 116,400 shares of TAAC stock as full consideration for the execution of the July 18th agreement, as well as the cancellation and termination of all previous agreements between it and TAAC, with the exception of the subscription agreement.

The minutes of this meeting reveal that after considerable discussion a resolution was unanimously adopted wherein the company directed its proper officers to issue

and deliver to Maguire & Co. 116,400 shares of the capital stock of TAAC.

A second resolution was adopted upon the motion of Jenks that Thompson and Kane should be compensated for the services rendered by them to the company in respect to the Guaranty financing. The directors, except Thompson and Kane, they having left the meeting room, unanimously voted to issue and deliver to Thompson and Kane 3600 shares of TAAC stock as compensation for their services, and directed the proper officers of TAAC to issue and deliver to them the shares.

The 3600 shares, by order of Thompson and Kane, were issued to Maguire & Co. to be held in escrow by it to indemnify TAAC against two asserted claims. These shares constituted a part of 7500 shares of TAAC that Thompson and Kane agreed to place in escrow with Maguire & Co. to protect TAAC from any claims arising out of Thompson's and Kane's dealings with others regarding the financing of the Guaranty contract. Kane later deposited 800 shares with Maguire & Co., leaving 3100 shares to be deposited by Thompson, which he never delivered, as he became ill on July 20, 1939, and died shortly thereafter. All outstanding claims were settled and 538 of these shares were used for that purpose, the remaining 3862 shares being returned to Kane and Thompson's estate.

Upon approval by the stockholders and directors on July 19th of the July 18th contract, Powers, Kane and Gordon commenced the preparation of the papers for the double closing. However, difficulties arose in the way of deficiencies on TAAC's part which threatened to block the closing. Maguire removed these difficulties by depositing an additional $100,000 as security to indemnify Marine with respect thereto. Thus, the double closing with Marine and Guaranty was accomplished before midnight on July 21, 1939.

Upon the closing of the contracts the attorneys, Powers, Kane and Gordon, sought compensation for their services,

Gordon and Powers suggested that they be paid $15,000 and Kane requested between $8,000 and $10,000. Their work commenced in January and continued through July 31st, when their fees were ultimately fixed. Their joint services included the organization of TAAC, the Guaranty contract, the underwriting agreement and registration of TAAC stock with the SEC, efforts to accomplish private financing, preparing papers for the double closing, together with opinions concerning many legal questions arising out of their employment. Several conferences took place. Maguire insisted that the attorneys accept stock for their services. The attorneys objected. Finally the attorneys agreed to take part of their fees in stock, provided Maguire would commit himself to purchase the bulk of the stock from them within a stipulated time. Maguire so agreed and each attorney received the amount of cash and stock as follows: Kane's total fee was $3,000. He was paid $1,000 in cash and received 2,000 shares of TAAC stock valued at $1.00 per share. Powers received a fee of $7500. He was paid $4250 in cash and received 3250 shares of TAAC stock valued at $1.00 per share. Gordon received a fee of $7500. He was paid $3,000 in cash and received 4,500 shares of TAAC stock valued at $1.00 per share. Of the shares of stock so issued, Maguire under his agreement with the attorneys purchased the following shares at $1.00 per share: From Kane 2,000 shares; from Powers 2,250 shares, and from Gordon 3,500 shares, making a total of 7,750 shares.

A special meeting of the directors was called on July 31st. A waiver of notice was signed by Maguire and Koontz —they being the only directors at that time; others having previously declined to serve or resigned. The agreements reached concerning the attorneys' fees were stated by Maguire and upon motion made, seconded and carried, the attorneys were voted the amounts of their fees as agreed upon to be paid in the manner as indicated; that is, part in cash and part in stock. The stock was ordered issued and delivered to the attorneys in the amounts as previously indicated.

On the same day, July 31st, over 90% of the outstanding stockholders of TAAC signed a written consent to the issuance of these shares to the respective attorneys in part payment of their fees. Upon ratification by the stockholders as indicated, the shares aforesaid were issued and delivered.

The original plan to dissolve AUTO was abandoned. TAAC became a holding company and AUTO was retained as its operating subsidiary.

Maguire became president of TAAC and AUTO upon the resignation of Thompson in July, 1939. Thompson thereupon became chairman of the respective boards until his death a short time thereafter.

TAAC in August, 1939, had bright hopes. It had reason to believe that the past June order of the government for guns would be repeated on a much larger scale. Such, however, did not occur, as federal appropriations for this type of weapon had been exhausted. Considerable time elapsed before additional orders were filed. Although war was imminent in Europe, France and England could not be interested as purchasers of the gun, mainly for the reason that ammunition of the caliber required was not available in either country.

The dark days of Dunkirk necessitated the accumulation of all types of available weapons; thus, began the flow of a steady stream of orders for the gun from our government and from England. Production was stepped up to the extent that within a two-year period delivery of over 300,000 guns brought into the treasury of TAAC gross receipts of approximately $100,000,000.

AUTO by this time was looked upon as one of the largest small arms manufacturers in America. The profits of the company were so enormous that TAAC built its own plant in which to produce the guns, and during the two-year period beginning in August or September, 1939, TAAC paid to its stockholders $10.50 a share, or in excess of $2,-

600,000 cash dividends. The complainant's shares during this period increased in value in the amount of approximately $500,000, not including about $130,000 declared and paid to her in dividends.

Maguire was the guiding influence in both corporations from the time he was elected president of each (August, 1939). The success of each was due practically to his untiring efforts in the realms of finance, production and sales.

Maguire's salary as president of TAAC and AUTO for the period covered in the complaint amounted to approximately $152,000, plus income, excess and war profit taxes amounting to approximately $42,000, from November 1, 1940, to October 31, 1941. The amounts constituting these items were approved by the directors of TAAC. During this period of two and one-half years TAAC and AUTO, after the payment of all expenses, realized profits in excess of $11,000,000.

TAAC was investigated in 1940 by the Attorney General of New York and the SEC. The Attorney General thought, because of the $10.50 dividend declared and paid on the same day, and the over-the-counter sales of TAAC stock, that certain insiders of the corporation might have purchased the stock and taken advantage of the corporation in this respect. He was anxious to get the whole picture and see who held stock in TAAC, which information he could best get from the transfer records. This investigation covered quite a period of time. Powers and Jacob Gruber, a New York lawyer, were retained to look after the interest of TAAC pertaining to both investigations. For their services they were paid $2500 and $6500, respectively.

In 1940 Kane instituted three suits in the Supreme Court of the State of New York. One suit was brought by Kane as executor of the estate of Colonel Marcellus H. Thompson against TAAC to recover salary due Thompson from March 3, 1939, until the date of his death. The second suit was a derivative stockholders' suit brought by Kane

in which he sought to have cancelled the 116,400 shares of TAAC stock issued and delivered to Maguire & Co. in July, 1939. The third suit was against Maguire personally. The directors voted to defend suits 1 and 2 and employed as counsel for that purpose Eugene Powers and the firm of Hayes, Wolf, Schwabacker and Sklar of New York City. The Thompson suit was settled for $7,000. The derivative stockholders' suit was discontinued. The suit against Maguire was settled. Eugene Powers and the Hayes firm received, respectively, $10,850 and $18,350 for their legal services rendered to TAAC. In the third suit, Maguire himself paid all the expenses connected therewith.

The foregoing seems to us to be a fair statement of the factual situation as indicated by the language employed by the Chancellor in the final decree as entered below.

The complainant below advanced the following contentions:

(A) That the following shares delivered to Maguire & Co. on the following dates were illegally issued and should be ordered cancelled.

(1) 3500 shares, March 31, 1939.

(2) 116,400 shares, July 21, 1939.

(3) 20,000 shares (subscription) beginning July, 1939.

(B) That the 3600 shares authorized to be issued to Marcellus H. Thompson and Thomas A. Kane on July 21, 1939, but upon Thompson's and Kane's order were issued and delivered to Maguire & Co., were illegally issued and should be ordered cancelled.

(C) That the 9750 shares issued and delivered to Eugene Powers, Thomas A. Kane and Mortimer S. Gordon on July 31, 1939 were illegally and fraudulently issued and should be cancelled.

(D) That TAAC unlawfully paid out certain sums

of money for the personal benefit of Maguire, for which Maguire should be made to account and pay back to TAAC.

(1) That Maguire received from TAAC from November 1, 1939, to October 1, 1941, a total salary of $49,743.50, including a tax reserve of $9,878.98, for which he rendered no substantial service in return.

(2) That the directors of TAAC increased Maguire's salary from $500 per month to $1,000 per month on March 21, 1940, and made the increase retroactive to January 1, 1940; that on March 27, 1941, the directors authorized an increase in Maguire's salary and payment of all income, excess and war profit taxes on such salary and made the same retroactive to November 1, 1940.

(3) That the counsel fees paid by TAAC to Jacob Gruber and Eugene Powers in 1940 of $6500 and $2500, respectively, represented personal services rendered to Maguire concerning an investigation of Maguire by the SEC and was not connected at all with the business of TAAC.

(4) That the counsel fees paid by TAAC to Eugene Powers and the firm of Hayes, Wolf, Schwabacher & Sklar, amounting to $10,850.00 and $18,350.00, respectively, for legal services concerning the Kane litigation in New York, represented services rendered for the individual benefit of Maguire.

The learned Chancellor (without filing a written opinion) entered on March 13, 1942, a final decree in words and figures as follows:

"And Now, to-wit, this 13th day of March A D. 1942, the above entitled cause having come on to be heard before the Chancellor, upon the bill of complaint as amended of Ida G. Blish, filed on behalf of herself and all other stockholders of Thompson Automatic Arms Corporation in her derivative right as a stockholder thereof, and upon the answers as amended of all of the appearing defendants, to-wit, Thompson Automatic Arms Corporation, Eugene D. Powers, Russell Maguire, Russell Maguire & Co., Inc., and Auto-Ordnance Corporation, and upon the depositions taken in the cause and admitted, and upon the evidence taken and the exhibits offered by the respective parties

and admitted by the Chancellor; and the said cause having been fully briefed and argued by the solicitors for the respective parties, and the Chancellor having maturely considered the matter;

"And the Chancellor having found, inter alia, that

"(A)   All of the shares of stock cancellation of which is sought by the bill of complaint filed in the above entitled cause, or in respect of which any claim of fraud, duress, lack of consideration or other illegality is made in the bill of complaint, or was made and litigated at the trial, to-wit,

"3,500 shares of the capital stock of Thompson Automatic Arms Corporation issued and delivered to defendant, Russell Maguire & Co., Inc., on or about March 14, 1939, mentioned and described in paragraph 24 of the bill of complaint;

"20,000 shares of the said stock issued and delivered to the said defendant, Russell Maguire & Co., Inc., in various amounts on or about April 5, 1939, May 2, 1939, May 26, 1939, July 12, 1939, August 2, 1939, September 22, 1939 and September 26, 1939, being the shares mentioned and described in paragraphs 26, 27, 28, 29, 57, 58, 59 and 60 of the bill of complaint;

"116,400 shares of the said stock issued and delivered to Russell Maguire & Co., Inc., on or about July 21, 1939, pursuant to a certain contract between Thompson Automatic Arms Corporation and Russell Maguire & Co., Inc., dated July 18, 1939, which shares are mentioned and described in paragraphs 48, 49 and 51 of the bill of complaint;

"3,600 shares of the said stock authorized by resolution of the Board of Directors of said corporation of July 19, 1939, to be issued to Marcellus H. Thompson and Thomas A. Kane, and issued and delivered in the name of Russell Maguire & Co., Inc., on or about July 21, 1939 and mentioned and described in paragraph 52 of the bill of complaint;

"3,250 shares of the said stock issued and delivered to the defendant, Eugene D. Powers, on or about July 31, 1939, mentioned and described in paragraph 53 of the bill of complaint;

"4,500 shares of the said stock issued and delivered to the defendant, Mortimer S. Gordon, on or about July 31, 1939, mentioned and described in paragraph 54 of the bill of complaint;

"2,000 shares of the said stock issued and delivered to the defendant, Thomas A. Kane, on or about July 31, 1939, being a part of the shares mentioned and described in paragraph 55 of the bill of complaint; were respectively, duly, regularly, voluntarily and lawfully issued by the said Thompson Automatic Arms Corporation, for fair

and adequate considerations, and pursuant to due, regular and proper corporate action of the Board of Directors, which was independent and disinterested, of Thompson Automatic Arms Corporation, and with full knowledge of all material facts and without any fraud, duress, coercion or overreaching whatsoever;

"(B) In any event, as respects the issuance and delivery of said 9,750 shares of said stock to the defendants, Eugene D. Powers, Mortimer S. Gordon and Thomas A. Kane, as above set forth, such issuance and delivery was duly, regularly and fairly approved, ratified and confirmed by the Board of Directors, which was independent and disinterested, of the defendant Thompson Automatic Arms Corporation, with full knowledge of all the material facts and without any fraud or overreaching, and the judgment and action of the Board of Directors so approving, ratifying and confirming such issuance and delivery was binding and conclusive.

"(C) The contract dated July 18, 1939 pursuant to which the said 116,400 shares were issued and delivered, was duly, regularly, lawfully and voluntarily entered into by Thompson Automatic Arms Corporation, pursuant to due, regular and proper corporate action of its Board of Directors, which was independent and disinterested, with full knowledge of all the material facts and without any fraud, duress, coercion or overreaching whatsoever, and said contract was likewise duly ratified, confirmed and approved by said Board of Directors and by the stockholders of the defendant Thompson Automatic Arms Corporation, and was duly, fairly and voluntarily performed; and the issuance and delivery of said 116,400 shares of said stock to the defendant Russell Maguire & Co., Inc., as above set forth, was duly, regularly and fairly approved, ratified and confirmed by the Board of Directors, which was independent and disinterested, of the defendant Thompson Automatic Arms Corporation, with full knowledge of all the material facts and without any fraud or other impropriety, and said judgment and action in so approving, ratifying and confirming such issuance and delivery was binding and conclusive, and the said issuance and delivery of said 116,400 shares of said stock to the defendant Russell Maguire & Co., Inc., as above set forth, was duly, regularly and fairly approved, ratified and confirmed by the Board of Directors, which was independent and disinterested, of the defendant Thompson Automatic Arms Corporation, with full knowledge of all the material facts and without fraud or other impropriety, and said judgment and action in so approving, ratifying and confirming such issuance and delivery was binding and conclusive, and the said issuance and delivery of said 116,400 shares to the defendant Russell Maguire & Co., Inc., was further duly and regularly ratified, confirmed and approved by the stockholders of the defendant Thompson Automatic Arms Corporation with full knowledge

of all the material facts at a meeting of said stockholders duly held on March 17, 1941;

"(D) The allegations of the amendment to the bill of complaint, verified November 7, 1941, charging mismanagement of the affairs of Thompson Automatic Arms Corporation in the payment by said corporation or its successors in interest of salaries and counsel fees, and all other charges of mismanagement against the defendants or any of them made in the bill of complaint as amended or litigated at the trial, are not sustained either in fact or law; and the said salaries and counsel fees were duly, regularly and fairly approved, authorized and paid pursuant to proper corporate action of the Board of Directors of the defendant Thompson Automatic Arms Corporation, without fraud or other impropriety."

From the Chancellor's decree, as indicated, the complainant has appealed. Her contentions before us are in substance the same as urged by her below.

Each contention, as stated, will be considered separately in chronological order. However, preliminary to a discussion thereof we think we should to some extent state an observation suggested by the appellant to the effect that in all of Maguire's dealings with TAAC, up to and including the closing on July 21, 1939, that he acted in a fiduciary capacity being cloaked with all the legal aspects of a promoter. It is said that Maguire's liability must be commensurate with the scheme of promotion on which he embarked with TAAC. Citing *Henderson v. Plymouth Oil Co.*, 15 *Del. Ch.* 40, 131 *A.* 165; *Old Dominion Copper Co. v. Bigelow*, 203 *Mass.* 159, 89 *N.E.* 193, 40 *L.R.A.(N.S.)* 314; *Bovay v. Byllesby & Co.*, 25 *Del. Ch.* 1, 12 *A.* 2d 178; *Allenhurst Park Estates v. Smith*, 101 *N. J. Eq.* 581, 138 *A.* 709; 14 *C.J. pp.* 251, 253; 18 *C.J.S. Corporations,* § 119. The respondents assert that Maguire was not a promoter, rather he acted solely in the capacity of an underwriter, and as such was not a fiduciary. *W. B. Foshay Co. v. Mercantile Trust Co.*, 175 *Minn.* 115, 220 *N.W.* 551; *Fletcher Cyc. Corp., (Rev. Ed.) Sec.* 189, p. 595.

The word "promoter" standing alone is of little import. A label as such often times is misleading. In order to de-

termine whether or not one is a promoter his course of action must be determined before his liabilities as such can be accurately ascertained. In the case of *Henderson v. Plymouth Oil Co.* [15 *Del. Ch.* 40, 131 *A.* 170] the court stated

"In a comprehensive sense 'promoter' includes those who undertake to form a corporation and to procure for it the rights, instrumentalities and capital by which it is to carry out the purposes set forth in its charter, and to establish it as fully able to do its business. Their work may begin long before the organization of the corporation, in seeking the opening for a venture and projecting a plan for its development, and may continue after the incorporation by attracting the investment of capital in its securities and providing it with the commercial breath of life."

We shall now consider the appellant's contentions relative to the issuance of the respective shares of stock as previously indicated.

(A-1)   Is is contended that the Chancellor erred in failing to hold that the 3500 shares of TAAC stock issued to Maguire & Co. on March 14, 1939 for alleged services were illegal and void for the following reasons:

(a)   That the shares were issued for alleged services performed prior to the incorporation of TAAC.

(b)   That no services were rendered by Maguire and/or Maguire & Co. to TAAC prior to March 14, 1939, and that any services rendered by Maguire and/or Maguire & Co. prior thereto were rendered for the personal benefit of Maguire.

(c)   That the 3500 shares were fraudulently and illegally issued by reason of an illegal scheme or plan of Maguire to obtain a secret profit from the sale of the Ryan Estate holdings to TAAC without disclosing such scheme to the stockholders of TAAC.

(d)   That the board of directors of TAAC were dominated and controlled by Maguire, and that the directors authorizing the issuance of said shares to Maguire & Co.

did not act independently or with full knowledge of all the facts in connection therewith.

It should suffice to say in answer to the first contention that services extended for a corporation before its creation constitute good consideration for the issuance of stock of the corporation organized under the Delaware law. *Shore v. Union Drug Co.*, 18 *Del. Ch.* 74, 156 *A.* 204.

As to the second contention it must be said that the services rendered by Maguire in reference to the Guaranty contract, up to March 14, 1939, inured immeasurably to the benefit of TAAC, for which a reasonable compensation could be paid either in cash or stock. The fact that Maguire & Co. stood to derive a collateral benefit as underwriter is of no real importance in this connection, other than securing in fact the benefits of the contract for TAAC, as it was at Guaranty's insistence that Maguire & Co. approved the contract as underwriter of the shares for public consumption. Compare *Rodgers v. Dodge* 243 *Mass.* 295, 137 *N.E.* 537; *Union Pacific Railroad Co. v. Frank*, (6 *Cir.*) 226 *F.* 906.

Under the next contention (c) it is said that the 3500 shares were fraudulently issued by reason of an illegal scheme of Maguire to obtain a secret profit from the sale of the Ryan Estate holdings to TAAC without disclosing such scheme to the stockholders of TAAC.

Any scheme pertaining to a secret profit could only have reference to the preliminary plan agreed upon in January, 1939, between Maguire and Thompson, representing the minority stockholders of AUTO, which included, among other items, a contract with Guaranty. That plan was abandoned prior to February 7, 1939, as evidenced by Thompson's letter to Guaranty of that date. We shall pass for the present any consideration of the question of fraud concerning these shares, other than to say that the appellant's contention that Maguire deceived the stockholders of TAAC must be affirmatively established by her. Mere assertions standing alone are not sufficient.

Under contention (d) it is said that Maguire and Maguire & Co. dominated the board of directors as of March 14, 1939, and that the directors did not act independently or with full knowledge as to all the facts in respect to the issuance of the 3500 shares. The burden of establishing these assertions rests squarely upon the shoulders of the appellant. *Bovay, et al., v. Byllesby & Co.*, 25 *Del. Ch.* 1, 12 *A.* 2d 178; *Bell v. Fred T. Ley & Co.*, 278 *Mass.* 60, 179 *N.E.* 294.

The directors, Marcellus H. Thompson, C. Leonard Corbet, Margaret Dillon, and Carmelo Mgegnieros met in special meeting on March 14, 1939. A waiver of notice for this meeting signed by all the directors was read and ordered annexed to the minutes. The chairman stated that negotiations had been concluded with Guaranty and that a proposed contract had been prepared embodying the terms agreed upon. The proposed contract (signed July 21st) was read. After considerable discussion the following resolution was adopted:

"Resolved that the Company purchase from the Guaranty Trust Company as sole surviving executor of the last will and testament of Thomas Fortune Ryan 18,505 shares of the capital stock of Auto-Ordnance Corporation and outstanding notes in the amount of $1,090,000 of that company with accrued interest thereon and an unrecorded chattel mortgage securing the same for the sum of $529,000 and that the Corporation enter into a contract with respect to the aforesaid purchase in the form annexed hereto as part of these minutes and as heretofore read and approved.

"Further Resolved that the President, Marcellus H. Thompson, be and he hereby is authorized and directed to execute and deliver such contract to the Guaranty Trust Company, and perform any and all other acts necessary and proper to carry out the spirit and intent of the above resolution."

Subsequent to the adoption of the foregoing resolution the chairman stated that Maguire had rendered considerable service in connection with the negotiations between TAAC and Guaranty and that such services were of great value to TAAC. It was then stated that Maguire & Co. would

be willing to accept as full compensation for such services 3500 shares of the capital stock of TAAC. Upon motion duly made and seconded the following resolution was adopted:

"Resolved that the Corporation issue to Russell Maguire & Co., Inc., as full compensation for services rendered to the company, 3500 shares of the capital stock of this Corporation.

"Further Resolved that the value of said services in the opinion of the Board of Directors was not less than $3500."

Then followed a resolution authorizing and directing the appropriate officers of TAAC to issue and deliver the 3500 shares and affix the corporate seal thereto.

On May 6, 1939, a call was issued for a special meeting of the stockholders to be held on May 9th. Under paragraph 11 of this notice the following appears:

"Confirming and ratifying the issuance and delivery of 3500 shares of stock of this corporation to Russell Maguire & Co., Inc., in consideration of its services in connection with the negotiations looking toward the execution of the final contract with Guaranty Trust Co. and Auto-Ordnance Corporation."

The appellant was present at the May 9th stockholders' meeting. After the election of directors the secretary reviewed for the meeting the activities of TAAC, the board of directors and various officers, and submitted to the meeting the minutes of the meeting of the incorporators of March 6, 1939, and the minutes of the meetings of the directors of March 8, 14 and 27. 1939. Then upon motion duly made and seconded the following resolution was unanimously adopted.

"Resolved that the acts of the Incorporators, Officers and Directors of the Company as set forth in the minutes above set forth be and the same hereby are ratified, approved and confirmed in all respects."

Eliminating any question of fraud or duress, it is our conclusion that these shares (3500) were issued for a valuable consideration, and that the action of the stockholders and directors relative thereto is final.

(A-2)   It is contended that the Chancellor erred in failing to hold that the 116,400 shares issued to Maguire & Co. on July 21, 1939, were fraudulently and illegally issued for the following reasons:

(a)   Maguire & Co. entered into the underwriting agreement of March 29, 1939, with knowledge that it was unable to perform the same.

(b)   The underwriting agreement of March 29, 1939, was invalid and expired on the failure of TAAC to obtain SEC registration.

(c)   Assuming the underwriting agreement to be valid and in force, Maguire & Co. failed to perform the same.

(d)   The 116,400 shares issued to Maguire & Co. on July 21, 1939, were issued in violation of the Constitution and statutes of the State of Delaware.

(e)   The 116,400 shares issued on July 21, 1939, were not authorized by proper corporate action.

The contention under (a) is that Maguire & Co. did not possess the essential working facilities in order to perform its obligations under the underwriting. contract of March 29, 1939, as no salesmen were included in its operational setup and its entire function had always been to wholesale securities rather than to retail them to the purchasing public.

Eliminating the suggestion of fraud we find no merit whatsoever in this contention.   Maguire & Co. became obligated under this agreement to purchase or find purchasers for the shares therein designated within 30 days after registration became effective with the SEC.   The burden of effective registration was TAAC's responsibility.   Registration was never accomplished; thus Maguire & Co. was never placed in the position to perform its obligations in this respect, and, certainly, it cannot be said that it was in default in any manner whatsoever.   The appellant's suggestion

falls in the category of speculation and conjecture, which cannot furnish the foundation for us to sustain her position in this respect.

As to the second contention, (b), it is urged that the underwriting agreement of March 29th was invalid because of the lack of mutuality. Paragraph 8(e) (1) of the agreement provides for cancellation by Maguire & Co. "if prior to the closing date, in your absolute judgment, political, economic or market conditions are such as to render the contemplated public offering of the common stock or consummation of the sale of the common stock to the public, or both, impractical or inadvisable." It is from this language that the appellant asserts her claim of lack of mutuality, in that she says the agreement not being binding on Maguire & Co. and subject to its absolute cancellation at any time was not binding on TAAC. This contention cannot be sustained. The question involved is one of good faith, proper motive and fair dealing, which by express terms or by implication is written into every contract. The term "absolute judgment," as indicated, means a judgment based upon sincerity, honesty, fair dealing and good faith, not one evidencing caprice or bad faith. In the case of *Vineyard v. Martin, Sup.* 29 *N.Y.S.* 2d 935, the court, in dealing with a contract containing a defeasance clause "unwise or inexpedient in the sole judgment" of the defendants, upheld the contract. See also *Colton v. Colton,* 127 *U.S.* 300, 317, 8 *S. Ct.* 1164, 32 *L. Ed.* 138; *Jay Dreher Corp. v. Delco Appliance Corp.,* (2 *Cir.*) 93 *F.* 2d 275; *Livesley v. Johnston* 45 *Or.* 30, 76 *P.* 13, 946, 65 *L.R.A.* 783, 106 *Am. St. Rep.* 647; *Fullington v. Ozard Poultry Supply Co.,* 327 *Mo.* 1167, 39 *S.W.* 2d 780; *Lehigh Structural Steel Co. v. Great Lakes Cons. Co.,* (2 *Cir.*) 72 *F.* 2d 229; 1 *American Law Institute, Restatement of the Law of Contracts, Sec.* 265, *comment* (*a*).

It is further asserted under (b) that the underwriting agreement expired on TAAC's failure to obtain SEC regis-

tration. The first paragraph of the underwriting agreement provides—

"The Corporation (TAAC) agrees, represents and warrants to the Underwriter (Maguire & Co.)

"(h) That a Registration Statement in respect to the common stock * * * shall be carefully prepared by the Corporation * * * and * * * shall become effective on or before June 24, 1939, unless the Underwriter shall consent to a later date * * *."

This contention, likewise, cannot be sustained, for the reason that Maguire & Co. waived the provision for registration under the July 18, 1939 agreement, which had been inserted in the March 29th underwriting agreement for its benefit. *Raner v. Goldberg,* 244 *N.Y.* 438, 155 *N.E.* 733; *Standard Oil Co. v. Central Dredging Co.,* 225 *App. Div.* 407, 233 *N.Y.S.* 279, *affirmed* 252 *N.Y.* 545, 170 *N.E.* 137.

Under contention (c) the appellant says that, assuming the validity of the underwriting agreement of March 29th, nevertheless, Maguire & Co. failed to perform its obligations thereunder. The appellant argues that the underwriting agreement gave to Maguire & Co. the right to purchase certain shares of TAAC stock at $2.00 per share, regardless of TAAC's inability to obtain SEC registration, and the refusal of Maguire & Co. to purchase sufficient shares in order to carry out the Guaranty contract constituted a breach of the agreement on its part. This assertion in substance means that Maguire & Co. was under a duty to waive the condition of SEC registration, which apparently was inserted in the agreement for its benefit, and to endow the corporation with its own funds by purchasing sufficient shares of stock to finance the Guaranty contract. We are unable to find any justification for the appellant's position, as neither precedent or logic supports her claim. We find no reason whatsoever why Maguire & Co. could not, under the terms of the agreement, insist, as it did, upon SEC registration. *Dravosburg Land Co. v. Scott,* 340 *Pa.* 280, 16 *A. 2d* 415.

Under contention (d) the appellant asserts that the

116,400 shares were issued by TAAC in violation of the Constitution and statutes of this State.

The constitutional provision indicated provides—

Article IX. *Section* 3: "No corporation shall issue stock, except for money paid, labor done or personal property, or real estate or leases thereof actually acquired by such corporation."

The statutory provision provides—*Section 14, Corporation Law, Rev. Code* 1935, § 2046:

"* * * the purchase price of the capital stock of any corporation organized or to be organized under any law of this State may be paid for, wholly or partly, by cash, by labor done, by personal property, or by real property or leases thereof * * *."

The appellant's contention is divided into two parts—

1. That stock could not be issued to Maguire & Co. for the cancellation of his alleged claims against TAAC growing out of the underwriting agreement of March 29, 1939.

2. That stock could not be issued to Maguire & Co. for the pledging of securities ($100,000) by Maguire & Co. with Marine Midland Trust Company in order to close TAAC's contract with Guaranty.

In the absence of fraud a release of a valid claim against a corporation provides adequate consideration for the issuance of stock, and the judgment of the board of directors as to the amount thereof shall be conclusive. *Sec. 14, Corp. Law, Delaware; Rodgers v. Kerbaugh, Inc.,* 174 *App. Div.* 674, 190 *N.Y.S.* 245; *Veeder v. Mudgett,* 95 *N.Y.* 295. The fact that the amount claimed is unliquidated is of no real import. Such a transaction is equivalent to the payment of cash by the creditor to the corporation for the stock, and the payment of cash by the corporation to the creditor in discharge of the indebtedness.

Even though a corporation may not issue its shares of capital stock except for the purposes included under the

constitutional and statutory provisions as indicated, nevertheless, we are unable to say that a portion of the services rendered, that is the pledging of securities with the Marine Midland Trust Company, were not such services as could be paid for by the issuance of stock. *Koplar v. Warner Bros. Pictures*, (D. C. Del.) 19 F. Supp. 173; *Arapahoe C. & L. Co. v. Stevens*, 13 Colo. 534, 22 P. 823; *Colonial Biscuit Co. v. Orcutt*, 264 Pa. 40, 107 A. 315; *Rodgers v. Dodd*, 243 Mass. 295, 137 N.E. 537; *Bull & Co., Inc. v. Morris*, 132 Misc. 509, 230 N.Y.S. 122, affirmed 226 App. Div. 868, 235 N.Y.S. 906; *Bovay v. Byllesby*, 25 Del. Ch. 1, 12 A. 2d 179. Such services formed an indivisible part of the whole service rendered to TAAC, without which the closing with Guaranty could not have taken place.

At a special meeting of the stockholders held July 19, 1939, the substance of the July 18th agreement with Maguire & Co. was made known to the stockholders, wherein it agreed to accept 116,400 shares of TAAC stock for its services rendered to TAAC in accomplishing the loan from Marine to TAAC as well as the cancellation and termination of all previous contracts between the two companies, except the subscription agreement calling for 20,000 shares. After considerable discussion, and upon motion duly made and seconded by Matthew J. Hall and the appellant, the following resolution was adopted:

"Resolved that the company issue and deliver to Russell Maguire & Co., Inc. 116,400 fully paid and non-assessable shares of the capital stock of the company in consideration of services to the company in connection with the financing of the company, the execution of the agreement of July 18, 1939 and the cancellation of all agreements between Russell Maguire & Co., Inc. and the company, with the exception of the subscription agreement."

Likewise, the directors at a special meeting held on the 19th of July, subsequent to the stockholders' meeting of the same day, approved the July 18th agreement and adopted a resolution authorizing the issuance of 116,400 shares to Maguire & Co. (The form and substance of this

resolution is the same as previously adopted by the stockholders.)

Under contention (e) it is argued that the 116,400 shares issued on July 21, 1939 were not authorized by proper corporate action.

At the May 9th stockholders' meeting seven directors were elected; to-wit, Jenks, Thompson, Kane, Knight, Swafford, Thomas and Edgar. The record reveals that at the July 19th directors' meeting five directors were present, each signing a waiver of notice of said meeting. Those present were Jenks, Thompson, Kane, Knight and Swafford.

The appellant contends that, since Thomas and Edgar were not given five days' notice of the meeting, in accordance with the bylaws, and did not sign a waiver of notice, any corporate action taken by the board at that time was illegal and void.

Thomas and Edgar were elected directors at the May 9th stockholders' meeting, and upon notice of their election declined to serve. This fact was reported to the board of directors by Marcellus H. Thompson at its May 19th meeting. Thomas and Edgar did not become directors of TAAC merely because of their election by the stockholders. Acceptance on their part was necessary. We conclude that by reason of their refusal to serve, as stated orally by them, neither of them became a director and that no notice of the July 19th directors' meeting should have been given to them, and any action taken by the board without notice to them was valid. 2 *Fletcher Cyc. Corp., (Rev.Ed.) Sec.* 413, *p.* 198; *Halpin v. Mutual Brewing Co.,* 20 *App. Div.* 583, 47 *N.Y.S.* 412; *Lockwood v. Mechanics Natl. Bank,* 9 *R.I.* 308; *Danville R. R. Co. v. Brown,* 90 *Va.* 340, 18 *S.E.* 278; 2 *Fletcher Cyc. Corp., (Rev.Ed.)* 71; 3 *Cook Corp., (8th Ed.)* 2277; 19 *C.J.S., Corporations,* § 727, 64; *Spellman, Corp. Directors, p.* 328; *Whittaker v. Amwell Natl. Bank,* 52 *N.J.Eq.* 400, 29 *A.* 203; *Cameron v. Seaman,* 69 *N.Y.* 396, 25 *Am. Rep.* 212; *United Growers Co. v. Neiser,* 22 *App.Div.* 1, 47 *N.Y.S.* 906.

Eliminating any questions of fraud or duress, it is our conclusion that these shares (116,400) were issued for a valuable consideration, and that the action of the stockholders and directors relative thereto is final.

(A-3)   Under this contention the appellant argues that the 20,000 shares (subscription) issued to Maguire & Co. were fraudulently and illegally issued and should have been ordered cancelled.

The appellant concedes that these shares fall in the category of subscription shares.   The shares were issued to Maguire & Co. in pursuance to the March 29, 1939, subscription agreement under which Maguire & Co. agreed to take 20,000 shares at $1.00 per share on or before July 24, 1939.   The purpose of the subscription was to defray certain corporate expenses, including costs pertaining to registration with SEC, and incorporating costs of TAAC. Whenever TAAC needed funds to meet the purposes under the terms of the agreement, it became the duty of Maguire & Co. to take up and pay for the number of shares necessary to meet the then present need.   Prior to July 24th, 7500 shares were delivered and paid for.   On July 18th, the subscription agreement was extended for 60 days, within which period of time Maguire & Co. agreed to take up the remaining 12,500 shares.   Of these 3500 were issued and paid for on August 1, 1939, 1000 shares on September 22, 1939, 2000 shares on September 25, 1939, and the balance, or 6000 shares, on September 30, 1939.

Three objections are advanced in reference to the issuance of these shares:

1. The authorization of the subscription was not voted by an independent board of directors.

2. Inadequacy of consideration.

3.   That the last 900 shares were illegally and fraudulently issued, since the 60 day period under the July 18th amendment to the subscription agreement had expired.

We shall pass for the present our consideration of the first objection. As to the second objection, it is our conclusion, in the absence of fraud or duress, that the agreement under which these shares were issued is valid in law, and that the consideration therein expressed is adequate. Under the third objection it is contended that by reason of an express stipulation in the July 18th agreement the parties made time of the essence thereof, which provisions should now be enforced; that is, once the 60 days expired from July 18th Maguire & Co. lost its right to demand further shares, and TAAC had no legal right without additional corporate action to issue any or all of the 9000 shares which were issued after the expiration of the 60 day period.

Part performance by reason of the issuance of the 3500 shares on August 1, 1939, precludes either party from treating time as strictly of the essence. The failure of either party to deliver or pay on the day specified did not permit the other instantaneously to rescind the agreement. 3 *Williston on Contracts, (Rev.Ed.) Sec.* 847, *p.* 2377. The acceptance of late performance constitutes a waiver of the delay in performance. *Dunn v. Steubing,* 120 *N. Y.* 232, 24 *N.E.* 315; *Texas Co. v. Pensocola Maritime Corp.,* (5 *Cir.*) 279 *F.* 19. We are unable to find a tender of the 9000 shares, or any part thereof, prior to the expiration of the 60 day period, therefore, the contract survived for the mutual benefit of both parties. *Dannant v. Fuller,* 120 *N.Y.* 554, 24 *N.E.* 815; *Rosenthal Paper Co. v. National Folding Box Co.,* 226 *N.Y.* 313, 123 *N.E.* 766; *Raudabaugh v. Hart,* 61 *Ohio St.* 73, 55 *N.E.* 214, 76 *Am.St.Rep.* 361; *Braig v. Frye,* 109 *Iowa* 184, 199 *N.W.* 977. See also *Sec.* 22, *Del. Corp.Law, Rev. Code* 1935, § 2054. The delay in the tendering and acceptance of the last 9000 shares until after the expiration of the 60 day period did not invalidate the issuance of the shares. Eliminating any question of fraud, it is our conclusion that these shares (20,000) were issued for a valuable consideration, and that the action of the

stockholders on May 9th and July 18th, and the action of the directors on March 14th relative thereto is final.

(B) The appellant contends that the 3600 shares issued to Marcellus H. Thompson and Thomas A. Kane on July 21, 1939, were fraudulently and illegally issued and should have been ordered cancelled.

The appellant concedes that directors and officers of a corporation may receive additional compensation for certain services rendered to the corporation, but contends such additional compensation must be authorized by the independent judgment of directors not interested and upon a full disclosure of all the facts and circumstances. It will be recalled that these shares were authorized by the stockholders at a special meeting on July 19th, and by the directors at a special meeting held later on the same day. Prior to the issuance of the shares Thompson and Kane ordered TAAC to issue the same to Maguire & Co. to be held by it in escrow in order to protect TAAC against any claims made by others against TAAC regarding the contemplated financing of TAAC prior to the closing of the Guaranty contract.

The appellant's objections to the issuance of these shares are:

1. She claims the shares were fraudulently issued by reason of a scheme then existing between Maguire, Thompson and Kane, under which Maguire & Co. could receive 120,000 shares for Maguire's services rendered to TAAC instead of the 116,400 shares issued to it July 21, 1939.

2. That seven directors were elected at the May 9th stockholders' meeting but only five were present at the July 19th directors' meeting, at which meeting these shares were authorized, and, since five days' notice as required under the by-laws was not given to all the directors and since the two absent directors, Thomas and Edgar, did not sign a waiver of notice, any business conducted at the July 19th directors' meeting was illegal and of no effect.

3. Since seven directors were elected at the May 9th stockholders' meeting, it was necessary to have four directors present in order to constitute a quorum, and, since only five directors were present, two of whom were Thompson and Kane who did not vote, a quorum was not present. Therefore, the action taken by the board on July 19th, in reference to the authorization and issuance of these shares, was illegal and of no effect.

We shall pass for the present any consideration of the first contention. As to the second contention, it presents the same question that we considered in reference to the authorization and issuance of the 116,400 shares to Maguire & Co. It should suffice to say that Thomas and Edgar, as previously referred to, were not directors as of July 19th meeting. As to the third contention, our determination must be reached in the light of certain by-laws which provide—

"1. The management of all the affairs, property and interests of the corporation shall be vested in a Board of Directors consisting of from three to seven persons who shall be elected for a term ending with the next annual stockholders' meeting and shall hold office until their successors are elected and qualified * * *.

"2. The number of Directors may at any time be increased or decreased, unless as otherwise provided in the certificate of incorporation, by vote of a majority of the stockholders entitled to vote at any regular or special meeting if the notice of such meeting contains a statement of the proposed increase or decrease, and in case of any such increase, except as aforesaid, the Board of Directors or stockholders at any general or special meeting held before the Board of Directors take action, shall have the power to elect such additional Directors to hold office until the next annual meeting of the stockholders and until their successors are elected and qualified.

Article IV: "7. A majority of the whole Board of Directors shall be necessary at all meetings to constitute a quorum for the transaction of business; but less than a quorum may adjourn any meeting which may be held on a subsequent date without further notice, provided a quorum be present at such deferred meeting."

The appellant contends that the board of directors of TAAC consisted of seven in number at all times between

May 9, 1939, and March, 1940. She says a quorum necessary to take any corporate action must consist of four directors, and that no valid action could be taken by the board on July 19th, in reference to these shares, unless four disinterested directors were present.

She contends that Thompson and Kane were interested directors, and under our ruling in the case of *Italo-Petroleum Corp. v. Hannigan*, 1 *Terry* 534, 14 *A.2d* 401, could not vote on the resolution authorizing the issuance of the shares to themselves, and since Swafford, Jenks and Knight, the remaining directors, did not constitute a quorum of four directors, their resolution, as adopted in respect to the authorization of these shares, was illegal and void.

The chairman of the May 9th stockholders' meeting, after determining the presence of a quorum, and without stating the number of directors to be elected in the absence of a resolution indicating the same, declared "that nominations for Directors of the corporation for the ensuing year were in order." Seven persons were nominated; viz., Thompson, Kane, Jenks, Swafford, Knight, Edgar and Thomas. Nominations were ordered closed. A vote was taken resulting in each nominee receiving a total vote representing 101,014 shares, whereupon the chairman declared that each of the nominees "had been duly elected as Directors of the company to serve for the term of one year and until their successors shall be elected and qualified."

Thompson, Jenks, Knight, Kane and Swafford, upon notice of their election, accepted the directorships to which they had been elected. Edgar and Thomas upon notice of their election in May or early June declined to accept the directorships to which they had been elected. Now the question, Should the number of directors (majority) for quorum purposes be determined based upon the number (7) elected at the stockholders' meeting, or upon the number (5) constituting the number of directors that accepted

and were in office as of the date of the director action herein complained of?

The appellant contends that the stockholders in electing seven directors for the ensuing year not only complied with the bylaw provision, but, in addition, designated or fixed the standard upon which the number (majority) required for quorum purposes must be determined.

The appellees on the other hand contend the clear meaning of the bylaw to be that any number of persons in office between three and seven should constitute a full board; otherwise, the express provision for a variable number of directors is nullified. They further contend under such a bylaw, even in the event of resignations (as distinguished from declinations), that any number of directors in office between three and seven would constitute a full Board and a majority of the directors in office would constitute a quorum.

We think under the present bylaw provision (that the board shall consist of from three to seven members) that stockholder action alone is not determinative of the question. Surely, election is an essential incident of directorship, but standing alone is not sufficient. Acceptance by the selectee after notice of his election is as essential as the election itself. *Spellman, Corporate Directors, Sections* 89 *and* 109; *Fletcher Cyc. Corporations, (Perm. Ed.) Vol.* 2, *Sec.* 314; 19 *C.J.S., Corporations,* § 727, page 64. Stockholder action in this respect is subject to a condition subsequent; that is, acceptance within a reasonable time after notice either orally, or in writing, or by a course of conduct in harmony therewith, and no presumption of acceptance should be indulged in until a reasonable time after notice of election to the selectee, then, if the directorship is not declined, it may be presumed to have been accepted by him. 19 *C.J.S., Corporations,* § 727, *page* 64. *Spellman, Corporate Directors, Section* 109. Here Edgar and Thomas upon notice of their election declined to serve, which declination we think reverts back to the date and time of their

election, thus, nullifying the stockholder action in respect to each of the two directorships. Edgar and Thomas were never directors of TAAC from May 9, 1939, to May 8, 1940.

The bylaw in this case does not necessitate that the board of directors of TAAC be any set number, as did the bylaw in the case of *Bruch v. National Guaranty Credit Corporation*, 13 *Del.Ch.* 180, 116 *A.* 738, cited by the appellant. The mere fact that the stockholders more or less coincidentally elected seven individuals to the board does not of itself show an intent or purpose of sufficient import to fix the whole number of the board at seven for the ensuing year. We conclude under the present bylaw that the full board of directors elected by the stockholders at the May 9th meeting consisted of five members, viz., Thompson, Kane, Knight, Jenks and Swafford, and that any three thereof would constitute a majority for quorum purposes.

All five directors were present at the July 19th meeting called for the purpose of obtaining director authorization for the issuance of 116,400 shares to Maguire & Co. and 3600 shares to Thompson and Kane. Now which directors were necessary to constitute a quorum for proper director action in this respect? The general rule, especially in the absence of a charter provision or bylaw to the contrary, is that where the board meets to consider a proposition in which one of its members is personally interested, the interested director loses *pro hac vice* his character as a director and he cannot be counted for quorum purposes. *Spellman, Corporate Directors, Sec.* 179; *Fletcher Cyc. Corporations, (Perm. Ed.), Vol.* 2, *p.* 211. Therefore, if during the course of a meeting a matter arises involving a director's personal interest, a new count of those present should be had to determine whether or not a quorum exists without the interested director.

When the meeting had advanced to the point of considering the question as to whether or not 3600 shares should be authorized to be issued to Thompson and Kane, it appears

that Thompson and Kane left the meeting, thus leaving present Jenks, Knight and Swafford. We find a quorum present, and conclude, in the absence of fraud, that their unanimous action on July 19th in authorizing the issuance of the 3600 shares to Thompson and Kane is final.

(c) The appellant under this contention asserts that the 9750 shares issued and delivered to Eugene Powers, Thomas Kane and Mortimer Gordon on July 31st were fraudulently and illegally issued and should have been ordered cancelled.

Several arguments are advanced as to the invalidity of the issuance of these shares.

1. The issuance of the shares was fraudulent.

(a) That Maguire, president of TAAC, compelled Powers, Kane and Gordon to agree to sell 7750 of said shares to Maguire & Co. at $1.00 per share.

(b) That Powers, Kane and Gordon were not entitled to payment in stock for legal services.

2. That the issuance of the 9750 shares was never authorized by the board of directors of TAAC.

3. The attempted ratification of the authorization and issuance of the shares on September 30, 1941, was ineffective.

(a) The ratification was attempted after suit was instituted by the appellant below.

(b) The directors on September 30, 1941, were under the domination and control of Maguire.

(c) The ratification was ineffective because the directors on September 30, 1941, did not have full knowledge or any personal knowledge concerning the issuance of the 9750 shares.

These shares it will be recalled were issued to complete the payments to Powers, Kane and Gordon for their legal

services rendered to TAAC up to and including TAAC's closing with Guaranty and Marine in July, 1939.

We shall pass for the moment any consideration of the charge of fraud under (1). It is urged under (2) that the issuance of these shares was not authorized by the board of directors of TAAC at the alleged July 31st meeting. This assertion is based upon the contentions that Maguire was an interested director and could not vote, and that Koontz was not legally elected a director at the July 20th directors' meeting.

As of the July 20th meeting Thompson, Jenks, Knight and Kane constituted all of the directors in office, Swafford having previously resigned on July 19th. The waiver of notice for the meeting of July 20th was signed by Jenks, Knight and Kane. The minutes reveal that they were the only directors present. Upon convening the meeting Jenks tendered his resignation as a director, which was accepted and so recorded by Knight and Kane. Koontz was then elected by Kane and Knight to fill the vacancy created by Jenks' resignation. Knight thereupon tendered his resignation, which was apparently accepted by Kane. Maguire was then elected to fill the vacancy created by Knight's resignation.

Maguire and Koontz assumed the duties of their directorships along with Thompson and Kane. Thompson resigned on July 21st and Kane resigned prior to July 25th, thus leaving only Maguire and Koontz in office as of July 31, 1939, the date of the director action herein complained of.

There can be no question but that Maguire & Koontz from July 20th up to and including July 31st exercised all of the attributes of their offices, and by their course of conduct and assertion of right held themselves out to be directors of TAAC under the color of their election as of July 20th. We conclude a quorum was not present at the time Koontz and Maguire were elected, and their elections in this respect were irregular; nevertheless, it must be said

that they were *de facto* directors of TAAC from the date of their election up to and including July 31st.

Insofar as the director action in authorizing the issuance of these shares by Maguire and Koontz on July 31st, we find, among other irregularities, the absence of a quorum, as the three vacancies then existing had to be counted in this respect. Their action, therefore, in authorizing the issuance of these shares was improper and irregular, irrespective of the question of interest on the part of Maguire.

The minutes of the July 31, 1939, meeting could not be found. The directors in office on September 31, 1941, ratified the authorization and issuance of the shares in question to Powers, Kane and Gordon. Such ratification falls within the domain of director authority. *Fletcher Cyc. Corp.*, (*Perm. Ed.*) *Vol. 2, Sec.* 429.

In respect to the ratification of September 31, 1941, we find, as did the Chancellor below, that the board then in office acted independently and upon an adequate disclosure of the facts and circumstances, free of fraud, duress and any overreaching whatsoever, and that the judgment and action of the board on September 30, 1941, in approving, ratifying and confirming such issuance and delivery of the shares in question was binding and conclusive.

The contention made by the appellant that the September 30, 1941, ratification was ineffective, since such occurred subsequent to the day that this suit was instituted below, is without merit. Courts generally look with apprehension upon ratification of previous corporate acts after an action has been instituted questioning the validity of such acts. However, in the absence of fraud subsequent action by the board within director authority will be held to be valid.

Having stated our observations relating to the legal aspects of this case concerning the authorization and issuance of all the foregoing shares, we shall now direct our attention to the factual situation as repeatedly urged by the appellant. Permeating her contentions regarding the

issuance of all these shares is a continuity of suggestion, as previously indicated, that Maguire and/or Maguire & Co. practiced certain acts of fraud upon the directors and stockholders of TAAC in order to effectuate the issuance of all of these shares. In other words, it is contended that Maguire and/or Maguire & Co. were promoters of TAAC, and, as such, they stood in a fiduciary relationship with TAAC which they betrayed by means of threats, untruthful assertions, deceit and a failure to disclose to both the directors and stockholders of TAAC at different periods the full facts and circumstances relating to their dealings with TAAC, and by reason of which TAAC was fraudulently induced to authorize and issue all of the shares of stock as previously indicated.

The appellant contends that the learned Chancellor's findings that all these shares were issued by TAAC with full knowledge of all material facts and without any fraud, duress, coercion, or overreaching whatsoever is not binding upon this court, since a large portion of the evidence is in the form of depositions. Citing *New York Trust Co. v. Riley,* 24 *Del. Ch.* 354, 378, 16 *A. 2d* 772, 783. In that case we stated,

"This court, ordinarily, will not disturb a finding on the facts in a hearing before the Chancellor, if it appears from the record that there was evidence to support the finding. *Chalfant v. Reinhardt*, 12 *Del. Ch.* 389, 113 *A.* 674. The reason for the rule, generally observed by the reviewing courts, is that the trial court sees and hears the witnesses, and is, therefore, the better able to determine the credit and weight to be given to their testimony. *Henderson v. Plymouth Oil Co.*, 16 *Del. Ch.* 347, 359, 141 *A.* 197. The reason for the rule falls when a large part of the testimony was not presented orally, as here * * *."

We have considered at great length the rule as announced. We are of the opinion that it should be modified to the extent that regardless of the state of the evidence below, if there be sufficient oral testimony in the record to support the findings of fact below, such findings should not be disturbed by this court. In the present case we find sufficient oral testimony to support the Chancellor's findings that all

of the shares previously indicated were authorized and issued by TAAC with full knowledge of all material facts and without any fraud, duress, coercion or overreaching whatsoever insofar as any of the appellees are concerned.

Having reached this conclusion it is immaterial as to whether or not Maguire and/or Maguire & Co. in their dealings with TAAC were promoters or underwriters up to the closing on July 21, 1939. The result would be the same in either case.

We are of the opinion, therefore, that the 3500 shares of TAAC stock issued to Maguire & Co. on March 31, 1939, the 116,400 shares issued to Maguire & Co. on July 21, 1939, the 3600 shares authorized to Thompson and Kane on July 19, 1939, but issued to Maguire & Co. on July 21, 1939, the 20,000 subscription shares issued to Maguire & Co. beginning July, 1939, and ending September, 1939, and the 9750 shares issued to Eugene Powers, Thomas A. Kane and Mortimer S. Gordon on July 31, 1939, were duly, regularly, voluntarily and lawfully issued by TAAC for fair and adequate considerations, and pursuant to due, legal and proper corporate action of the stockholders and the board of directors, which was independent and disinterested, acting with full knowledge of all material facts and without any fraud, duress, coercion or overreaching whatsoever.

On March 14, 1939, TAAC's directors authorized and directed an issuance of 16,500 shares of TAAC stock to Matthew J. Hall as a finding fee. The appellant contended below that these shares were illegally issued. The Chancellor held the 16,500 shares to have been duly issued for a valuable consideration without fraud, duress or any overreaching whatsoever. Although included in the appellant's assignments of error, she did not press her objection to the issuance of these shares before us, the reasons being that Hall was not served with process below, nor did he appear personally or by solicitor, and, further, Hall was not a holder of record of any shares of TAAC stock at the time of the filing of this action below.

We shall now consider the appellant's contentions relating to the alleged mismanagement of TAAC's corporate affairs on the part of Maguire.

(D) The appellant contends that TAAC paid out large sums of money for the personal benefit of Maguire for which Maguire should be made to account for and pay back to TAAC.

1. That Maguire as president of TAAC received a salary of $49,743.50, including a tax reserve of $9,878.98, covering a period commencing November 1, 1939, and ending October 1, 1941, for which he rendered no substantial service to TAAC in return.

Maguire was president of both TAAC and AUTO from November 1, 1939, up to and including October 1, 1941. During this period TAAC paid Maguire a salary amounting to $49,743.50, including tax reserves, and AUTO paid to him a salary of $110,056.50, including tax reserves. It is contended, since AUTO was the operating company and since TAAC's entire corporate duties were those only of a holding company, that Maguire performed no substantial services for TAAC, and, therefore, was not entitled to receive from TAAC the substantial salary paid to him.

It is further contended that since no other officer of TAAC received any salary, such indicates that the amounts paid to Maguire as salary were paid solely because of his domination and control of the board of directors and his holding of voting control of a majority of the outstanding stock of TAAC. The appellant argues that Maguire's compensation was so large under the circumstances involved that it constituted spoilation and waste of corporate funds, in which case a complete investigation in equity is justified. Citing *Winkelman v. General Motors Corporation,* (*D.C.*) 39 *F. Supp.* 826; *Seitz v. Union Brass & Metal Co.,* 152 *Minn.* 460, 189 *N.W.* 586, 27 *A.L.R.* 293.

The corporate purposes of TAAC and AUTO, its wholly

owned subsidiary, are one and the same. Together they represent but a single venture, the aim of which is to produce for the mutual benefit of all of TAAC's stockholders. In a corporate set-up such as here the court will determine the reasonableness of the salaries paid by the undertaking as a whole, irrespective of the legal entities involved. *Bishop v. United States,* (10 *Cir.*) 16 *F.* 2*d* 410; *Interstate Telephone Co. v. Baltimore & Ohio Telephone Co.,* (*C.C.*) 51 *F.* 49, *affirmed C.C.,* 54 *F.* 50; *Walker v. Southwestern Mines Development Co.,* 52 *Ariz.* 403, 81 *P.* 2*d* 90; 1 *Fletcher Cyc. Corp.,* (*Rev. Ed..*) p. 154. The appellant's assertion of fraud based upon the theory that since Maguire was president and majority stockholder of TAAC he necessarily dominated and controlled the board of directors are insufficient observations to impugn the integrity and independence of the directors. *Carson v. Allegheny Window Glass Co.,* (*C.C.*) 189 *F.* 791, *at page* 799; *Rogers v. Nashville & St. Louis Railway Co.,* (6 *Cir.*) 91 *F.* 299; *Cowell v. McMillin,* (9 *Cir.*) 177 *F.* 25, *at page* 43; *Bell v. Fred T. Ley & Co.,* 278 *Mass.* 69, 179 *N.E.* 294; *In re New York Railways Corp.,* (2 *Cir.*) 82 *F.* 2*d* 739, *certiorari denied* 298 *U.S.* 618, 56 *S. Ct.* 959, 80 *L. Ed.* 1406; *Guilfoyle v. Brown,* 149 *Kan.* 615, 88 *P.* 2*d* 1082; *Cleary v. Higley,* 154 *Misc.* 158, 277 *N.Y.S.* 63, *affirmed* 246 *App. Div.* 698, 284 *N.Y.S.* 989; *Browne v. Smith,* 44 *Misc.* 575, 90 *N.Y.S.* 204; 3 *Fletcher Cyc. Corp.,* (*Rev. Ed.*) *Sec.* 940.

Regardless of the accusations made against Maguire it must be conceded, largely because of his business acumen and constant efforts, the joint enterprises of TAAC and AUTO within the space of two and one-half years sprung from the steps of poverty to a successful and internationally known arms corporation. During this period $100,000,000 in sales was consummated, which after the deduction of corporate expenses yielded net profits of $11,000,000. Such results in our opinion standing alone completely justify the salary and the tax reserves paid to Maguire. *Heller v. Boylan,* 29 *N.Y.S.* 2*d* 653; *affirmed* 262 *App. Div.* 1020,

30 *N.Y.S.* 2*d* 847; *Gallin v. National City Bank of New York*, 155 *Misc.* 880, 281 *N.Y.S.* 795; *Winkelman v. General Motors Corp.*, (*D.C.*) 44 *F. Supp.* 690. Further, we know of no reason why TAAC could not have furnished executive services to its wholly owned subsidiary, AUTO, and paid for the same. *North American Co. v. Securities & Exchange Comm.*, 327 *U.S.* 686, 66 *S. Ct.* 785, 90 *L. Ed.* 945.

Since no fraud or duress has been established in reference to the salary paid Maguire by TAAC, the action by the directors in determining the amount to be paid is final. *McQuillen v. National Cash Register Co.*, (4 *Cir.*) 112 *F.* 2*d* 877; *Holthusen v. Edward G. Budd Manufacturing Co.*, (*D.C.*) 53 *F. Supp.* 488.

2. The appellant contends that TAAC increased Maguire's salary from $500 per month to $1000 per month on March 21, 1940, and illegally made the increase retroactive to January 1, 1940, and that on March 27, 1941, TAAC authorized an additional increase in Maguire's salary, including tax reserves, and illegally made the same retroactive to November 1, 1940.

The appellant's argument under this contention is based upon the general rule that once an officer's salary has been fixed for a given period the directors cannot at a subsequent meeting raise the salary and make their action retroactive. This is so, says the appellant, for the reason that the retroactive feature of the salary, together with the tax reserves, must be regarded as being without consideration, since the amount of salary to Maguire had been fixed by previous agreement and the services had been performed. Citing *Boyum v. Johnson*, (8 *Cir.*) 127 *F.* 2*d* 491; *Jones v. Morrison*, 31 *Minn.* 140, 16 *N.W.* 854; *Schall v. Althans*, 208 *App. Div.* 103, 203 *N.Y.S.* 36; *Collins v. Hite*, 109 *W. Va.* 79; 153 *S.E.* 240; *In re Fergus Falls Woolen Mills Co.*, (*D.C.*) 41 *F. Supp.* 355; *Thauer v. Gaebler*, 202 *Wis.* 296, 232 *N.W.* 561.

Conceding the general rule to be as stated, nevertheless,

we find its application subject to two well recognized exceptions; (1) Where an implied contract is shown; (2) Where the amount awarded is not unreasonable in view of the services rendered. *Osborne v. United Gas Improvement Co.,* 354 *Pa.* 57, 46 *A. 2d.* 208, 164 *A.L.R.* 1119; *Wyles v. Campbell,* (*D.C.*) 77 *F. Supp.* 343; *Koplar v. Warner Bros. Pictures,* (*D.C.*) 19 *F. Supp.* 173.

We conclude from the evidence that the services rendered by Maguire were unusual in character and extraordinary, from which TAAC received great gains and profits; therefore, the retroactive feature of Maguire's increases in salary and tax reserves, as indicated, were proper under the second exception as noted above.

3. Under this contention the appellant argues that the counsel fees paid by TAAC to Jacob Gruber and Eugene Powers in 1940 of $6500 and $2500, respectively, represented personal services rendered to Maguire relating to an investigation of Maguire by SEC and was not connected at all with the business of TAAC.

It is said that the sum of $9,000 paid to Powers and Gruber as counsel fees was for services in representing Maguire personally concerning an investigation by the SEC for criminal violation of the *Federal Securities Statutes,* 15 *U.S.C.A.* § 77a, et seq., with which TAAC was not connected in any respect whatsoever.

Upon a careful study of the evidence we find that prior to July, 1940, certain shares of TAAC stock had come into the over-the-counter market through private sales with no registration statement then in effect; that at about the same time TAAC simultaneously declared and paid a substantial dividend; that because of these happenings rumors became prevalent concerning speculation in TAAC stock, which prompted the SEC and the Attorney General of New York to conduct extensive investigations into TAAC's corporate affairs. We further find that these investigations were of deep concern to TAAC, since AUTO at the time was

negotiating with the Federal Government for important contracts and certainly any unfavorable publicity concerning TAAC might cause the government to end its negotiations; that the employment of Powers and Gruber lasted from July, 1940, through November, 1940, during which time many conferences were held with both SEC officials and representatives of the office of the Attorney General of New York. Many corporate records were made available and other written information prepared and submitted by TAAC until at last the two investigations were ultimately closed to the satisfaction of TAAC.

We conclude from the evidence that TAAC employed Powers and Gruber; that their services were performed for and inured directly to the benefit of TAAC, and that the compensation paid by TAAC to them was reasonable and proper under all the circumstances.

4. Under this contention the appellant maintains that the counsel fees paid by TAAC to Eugene Powers and the firm of Hayes, Wolf, Schwabacher and Sklar of New York City, amounting to $10,850 and $18,350, respectively, for legal services concerning the Kane litigation in New York, represented services rendered for the individual benefit of Maguire.

It will be recalled that Kane brought a derivative stockholders' suit in New York for the purpose of having Maguire & Co's. shares in TAAC ordered cancelled. TAAC, Maguire and Maguire & Co. were respondents in that suit. Other suits were also brought, one of which was to recover salary due Thompson as president of TAAC prior to his death; another was a personal action against Maguire. The appellant contends that TAAC was not a respondent in the Kane suit except in form only, as the litigation involved the rights of stockholders in reference to their respective shares, of which TAAC had no corporate interest whatsoever.

The evidence reveals that Maguire employed and paid

his counsel for representing him in his individual capacity; thus, we are concerned only with the fees paid by TAAC, and the question is whether or not they were properly paid under the circumstances. We find the general rule to be that a corporation may defend a stockholder's derivative action (although theoretically any recovery rebounds to the benefit of the corporation) if the corporate interests are threatened by the suit, and in connection with the defense the corporation may properly pay counsel fees. *Kirby v. Schenck, Sup.*, 25 *N.Y.S.* 2d 431; *Godly v. Crandall & Godly Co.*, 181 *App. Div.* 75, 168 *N.Y.S.* 251; *Esposito v. Riverside Sand & Gravel Co.*, 287 *Mass.* 185, 191 *N.E.* 363; *Corey, v. Independent Ice Co.*, 226 *Mass.* 391, 115 *N.E.* 488.

We are of the opinion that the directors of TAAC, if they thought the permanent welfare of the corporation was involved in the Kane litigation, could employ counsel to appear for it and act in its behalf. The Chancellor in holding that the payment of these fees was proper necessarily determined that it was to the best interest of TAAC that it appear and defend the Kane litigation, and, further, that such action was taken by the directors in the absence of fraud or duress. These findings by the Chancellor will not be disturbed since there is sufficient oral testimony in the record from which such a conclusion could be fairly drawn.

Concluding as we have, that TAAC was justified in defending the Kane litigation, the employment of counsel for that purpose followed in the natural course of events. The compensation for their services was fixed by the board of directors at their March 4, 1941, meeting. Such action by the directors is final.

Finally the appellant contends that the Chancellor erred in excluding evidence tending to establish the following facts:

(1) That Maguire was not licensed to publicly sell securities in the year 1939.

(2)  The market value of TAAC stock for the period beginning July 7, 1939, and ending December 31, 1939.

(3)  That Russell Maguire and his companies were under investigation by the Securities & Exchange Commission for criminal violation of the federal laws relating to the sale and manipulation of securities.

In reference to the above objections, we find no error in respect to the Chancellor's rulings thereon.

We recognize that in the space consumed we have not dwelt in detail with the multitude of arguments advanced by the appellant.  Nevertheless, we feel that the substance of all her contentions have been disposed of by us.

For the reasons indicated the decree of the Chancellor as entered below is affirmed.